COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| C.B., | § | No. 08-11-00286-CV |
| Appellant, | § | Appeal from |
| v. | § | 65th District Court |
| TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICE, | § | of El Paso County, Texas |
| Appellee. | § | (TC #2009CM4751) |

## **O P I N I O N**

This is an appeal from an order terminating C.B.'s parental rights to three minor children. She does not challenge the statutory findings justifying termination. She challenges only the best interest finding. In three issues, C.B. complains that: (1) the trial court erred in denying her request for a directed verdict; (2) the evidence is factually insufficient to support the jury's finding that termination is in the children's best interest; and (3) the evidence is legally insufficient to support the jury's finding that termination is in the children's best interest.

### **FACTUAL SUMMARY**

#### *Parties Involved*

C.B. was born May 24, 1982. She has four children, three of whom are the subjects of this suit: N.O., Y.O., and D.O..[1] N.O. was born in 1998 and was thirteen years old at the time of

---

[1] The fourth child, who was six years old at the time of trial, is not a subject of the suit because she is with her biological father.

trial. Y.O. was born in 2004. He had just turned seven. The youngest is D.O., who was only three years old.

N.O. and D.O. have the same father, D.L. D.L's parental rights to both children have already been terminated. Y.O.'s father is E.E. E.E.'s parental rights to Y.O. were terminated as part of the instant suit. E.E.'s parents, Y.O.'s paternal grandparents, intervened seeking to adopt Y.O. C.B.'s poor judgment in men also exposed her children to physical abuse. At trial, there was extensive testimony regarding C.B.'s destructive relationships.

### C.B.'s Relationship with D.L. (Father of N.O. and D.O.)

C.B. and D.L. began their relationship in 1997 when C.B. was 14 years old. They dated for a few months before D.L. was arrested, in part, for sexual assault of C.B., who at the time was just a child herself. D.L. was incarcerated for a period of ten years (from 1997 until 2007).[2] At some point in their relationship, C.B. became pregnant with N.O.[3] After D.L.'s release in 2007, C.B. started dating him again. During this time, C.B. became pregnant with D.O. C.B. testified that the relationship did not last long because D.L. assaulted her a second time. N.O. was home when the assault occurred.

C.B. testified that after this second relationship with D.L ended, she learned that, under the conditions of his parole, he was to have no contact with her. She claimed that she was completely unaware of the prohibition at the time she was seeing him. At trial, C.B. was asked why she would date D.L again after he had assaulted her once and had been in prison on "several different charges." C.B. replied, "I wanted to give him a chance with his -- an opportunity with

---

[2] Based on the questions at the termination hearing, it appears D.L. was convicted of burglary of a habitation after breaking in to C.B.'s home and allegedly assaulting her. However, at the hearing, C.B. said she thought he was actually convicted of sexual assault. She testified against D.L. in detail during his trial.

[3] N.O. was born on February 21, 1998.

his son." In 2008, C.B. obtained a protective order against D.L., but she never pursued the issue beyond a temporary order.

### C.B.'s Relationship with E.E. (Father of Y.O.)

C.B. began dating E.E. in 2002, while married to her first husband.[4] The couple moved in together in 2002 for a period of time, but E.E. lost his job and moved out of the apartment. C.B. then went back to living with her husband. C.B. continued to maintain a relationship with E.E. while living with her husband. In 2004, C.B. gave birth to Y.O.

In 2005, E.E. was incarcerated after assaulting C.B. In February 2006, he violated a protective order and was sent to jail. However, C.B. testified that in June 2006, when he was released from jail, she "went back with him." In 2007, C.B. accused E.E. of sexual assault. She also testified that she called the police on several occasions because he physically assaulted her. C.B. initially testified that she only sought two protective orders against E.E., one in 2006 and another in 2008. She later testified that she again tried for a protective order in 2009. None was made permanent.

C.B. and E.E. continued to have an on-again, off-again relationship until 2010. C.B. described the relationship as "very tormenting, vicious cycle." She acknowledged that E.E. "always stayed at [her] house," but claimed that he never lived there. She testified that numerous police reports were filed during their relationship regarding abuse.

There was also evidence that E.E. assaulted N.O. E.E. would hit N.O. in the stomach, kick him, and call him names. C.B. claimed that she did not know about the abuse until she received the psychological evaluations. She noticed that N.O was acting out but she "was

---

[4] C.B. has been married twice. She does not have children from either marriage. From 2001 through 2005, C.B. was married to C.S. During the marriage, C.B. had a sexual relationship with E.E. from which Y.O. was born. From 2007 through 2010, C.B. was married to H.B. Once again, there were no children born as a result of this marriage. However, D.O., the daughter of C.B. and D.L., was born during this second marriage.

overwhelmed and worn out with [N.O.] -- with [N.O.'s] issues, that I basically thought that it was just -- a fit or anything that [N.O.] would have." Despite claiming she knew nothing about the abuse before seeing the evaluations, on a much earlier occasion, C.B. called the police after witnessing E.E. throw a shoe at N.O. Even after that incident, C.B. would leave N.O. alone with E.E.[5] C.B. also admitted that her mother told her that E.E. hit D.O.

## C.B.'s Relationship with R.C.

In 2008, C.B. met R.C. in Juarez. He worked as a professional hit man for "La Linea," a Juarez drug cartel. In 2009, C.B. was caught crossing the international border with marijuana in her backpack. She claimed that R.C. had planted a pound on her. Legal documents indicated that she pled guilty to third-degree felony possession of marijuana between five and fifty pounds. C.B. testified that after the seizure of the drugs, R.C. crossed the border illegally on two separate occasions, came to her home, and threatened to kill her. He physically abused her on both occasions. Several documents detailing his criminal history were introduced into evidence. On December 1, 2009, R.C. pled guilty to family-violence assault against C.B. and was placed on community supervision for fifteen months.[6] Thirteen days later, he pled guilty to the federal offense of "[i]mproper entry by an alien" and was ordered to remain in custody pending sentence. On March 10, 2011, he again pled guilty to a family-violence assault against C.B. He was sentenced to serve 360 days in the El Paso County Detention Center.

---

[5] C.B. admits that there were several instances of abuse against her and a pattern of aggressive behavior. Nevertheless, she would leave town to escape from the abuse and in doing so, leave her children behind with E.E., the aggressor. She knew he would hurt her but she didn't think he would hurt the children.

[6] On January 10, 2011, an order was entered revoking R.C.'s community supervision and sentencing him to serve 180 days in the El Paso County Jail.

## C.B.'s Relationship with F.M.

C.B. met F.M. in 2006 by frequenting a store called "Extreme Tattoos," which provided tattoos and body piercing. In May 2010, C.B. began working for F.M. but they did not start dating until September or October or 2010. At that time, F.M. also became her neighbor.

C.B. claimed to be unaware F.M. had been convicted of possessing drug pipes, detoxifying liquids for urinalysis, bongs, Ecstasy pills, and Ecstasy cigarettes.[7] C.B. also was unaware that F.M. had been arrested for possession of marijuana in 2004. She was admittedly aware that he was arrested in 2005 for family violence against his wife.

C.B. testified that she needed F.M. to drive the children because she did not have insurance or a driver's license. She frequently drives without a license or insurance and has received numerous tickets.

### *Origination of the Suit*

The Texas Depart of Family and Protective Services first became involved in 1998. C.B. was only sixteen years old and N.O. was five months old. The Department became involved after a report that C.B. had left N.O. alone for an undetermined amount of time. During this time, C.B. twice tested positive for drugs. In 1999, C.B. was placed into foster care and her mother became N.O.'s primary caretaker. In 2005, the Department conducted a second evaluation because N.O. had red marks on his face. C.B. admitted that she would discipline N.O by hitting him. According to C.B., she "didn't know better back then."

In 2007, C.B. was investigated for neglectful supervision when she failed to pick up her children from day care. She again tested positive for drugs. Apparently she was also involved in an automobile accident in Juarez involving alcohol and a fatality. She was hospitalized for a

---

[7] Contrary to C.B.'s assertion, F.M. testified at trial that: "I told her that I had been arrested for -- for the paraphernalia, the drug paraphernalia things."

month and detained on criminal charges which were later dismissed. The Department was unable to contact her during her detention and the children were left with their grandmother.

In August 2008, TDFPS received allegations that C.B. would leave her children alone or with a neighbor and TDFPS began an investigation leading to the instant suit. C.B. admitted using cocaine and partying in Juarez, one time staying across the border for more than two weeks. On that occasion, she left the children with her mother. She admitted to hitting N.O. with a belt buckle and slapping him in the face. The children were referred to a Family Based Safety Service caseworker. C.B. was asked to complete parenting and domestic violence classes, individual therapy, and drug assessment. She admittedly never attended parenting classes or therapy. She repeatedly tested positive for cocaine and was drinking heavily. On June 23, 2009, C.B.'s mother called the Department to let them know that C.B. was in Mexico and was feeling overwhelmed; the children were with their grandmother. TDFPS took possession of the children on June 25, 2009, and pursued a dual track approach providing services in aid of possible reunification, and maintaining its right to seek termination as an alternative. A service plan was filed with the court on September 4, 2009. The Department was beginning overnight visitations between C.B. and her children at that point when C.B. again tested positive for drugs.

### *February 25, 2011 Mediation and Settlement Agreement*

On February 25, 2011, the parties entered into a settlement agreement pursuant to Family Code Section 153.0071 and Section 154.001 et. seq. of the Texas Civil Practice and Remedies Code, which provided:

. . . .

5. The Parties agree to the entry of an order of 'Return & Monitor' of all three children.

6. The return shall occur on Monday Feb. 28, 2011.

7. A background check of [F.M.] shall be performed.

8. Respondent [C.B.] will:

>   a) obtain and provide a copy of a driver's license and motor vehicle insurance as a condition of returning the children.
>
>   b) attend Narcotics Anon.
>
>   c) will not change [N.O.'s] medication.
>
>   d) not allow any male in her residence after 8:00 p.m.
>
>   e) provide hair follicle [sic] test and results.
>
>   f) provide transportation as required for the children for therapy, school, and visitation.
>
>   g) [N.O.] will attend Teen Al-Anon.
>
>   h) provide day care.
>
>   i) permit access to her probation records to TDFPS.

9. Respondent father [E.E.] will have supervised visitation with children. Supervision may be by his [E.E.'s] mother.

10. Parties will not pass messages through the children.

*See* TEX.FAM.CODE ANN. § 153.0071 (West 2008); TEX.CIV.PRAC.&REM.CODE ANN. § 154.002 (West 2011).

The court also entered a temporary order pursuant to Section 263.403 of the Family Code for the monitored return of the children. It provided:

> 3.1     Pursuant to § 263.403, Texas Family Code, the Court finds that placing the children with there [sic] mother **[C.B.]** while retaining jurisdiction, is in the best interest of the children because the parties agree to Return and Monitor during binding mediation. It is in the best interest of the children for the Department to monitor the placement. **The children will be placed in the home of [C.B.] on or about February 28, 2011.** [Emphasis in original].
>
> 3.2     **IT IS THEREFORE ORDERED** that the Department shall place the children and shall continue to serve as temporary managing conservator of the children, shall monitor the placement to ensure that the children is [sic] in a safe

- 7 -

environment, and shall, if circumstances indicate that the home is no longer a safe environment, remove the children from the home of **[C.B.].** [Emphasis in original].

The individuals involved from the Department's perspective were Thelma Mallard, the case worker; Cynthia Lopez, the Department Supervisor; Terri Zumwalt, the CASA volunteer advocate; Alison Gutierrez, the attorney ad litem for the children; and the children's therapist, Elizabeth Maldonado.

### *Return of the Children*

The children were to be returned to C.B. on February 28, 2011. Cynthia Lopez testified that C.B. called her on the day of the placement and expressed some concern about the children's day care and appointments interfering with her work schedule. C.B. told Lopez that she wanted to cancel some of the children's upcoming appointments. Lopez told C.B. that the children's appointments "were very important as well, because a lot of them were therapy appointments." C.B. also wanted to know why her mother could not be a caregiver. Lopez explained that the grandmother had received a negative home study and that she had not been approved because she had not kept doctors' appointments, had flushed N.O.'s medication down the toilet, and had a volatile relationship with C.B.[8] According to Lopez, C.B. expressed her understanding of the situation, said she had already arranged for day care, and professed there would not be a problem. Lopez admitted that she did not put the child care restriction in writing. But Mallard testified that C.B. was informed that all persons not authorized by the Department needed permission before having contact with the children and all others were prohibited. The CASA

---

[8] N.O. was diagnosed with ADHD when he was three or four years of age and prescribed Zoloft. By the time he was six or seven, he had been diagnosed with depression. The child's grandmother did not believe in medicating him and flushed his medication. C.B. testified that she and her mother were against medication due to cultural beliefs and that she did not believe in depression. N.O. eventually spent a month and a half at the Lee & Beulah Moor Children's Home, but C.B. withdrew him due to pressure from her mother.

advocate testified that Lopez and Mallard both told C.B. that she could not have her mother or F.M. around the children.  C.B. claimed she did not know of these restrictions.

During the evening hours of February 28, Mallard returned the children to C.B.'s residence.  The grandmother was there at the time.  According to C.B., she told Mallard that she needed her mother to watch the children because she had to be at work.  She planned to enroll N.O. in the YWCA afterschool program but the arrangements were not yet in place.  She also purportedly told Mallard that her mother would pick up Y.O. from the bus stop because her employer had threatened termination.  Mallard testified that she asked for the name of the day care where the children were enrolled and that C.B. gave her the information, along with other information concerning the children.

### Re-Removal of Children

On March 3, 2011, the children were once again removed.  The concerns began when Mallard called to confirm the children were enrolled in the day care C.B. listed on one of the placement forms.  Mallard was informed that only D.O. had been enrolled.  Mallard then called Y.O.'s school and was told that he was not enrolled in their afterschool program and he would be taking the bus home.  Mallard informed Lopez, who suggested they go to the home and investigate "who would be picking up the kids."  Lopez arrived first and saw F.M. and C.B.'s mother getting into a car.  F.M. was carrying D.O. in his arms.  Lopez followed them as they drove to the bus stop to retrieve Y.O. and then returned to the apartment.  At that point, Lopez confronted F.M. and told him he was not approved to pick up the children.  C.B.'s mother departed, and Lopez told F.M. that C.B. should call her attorney and the Department.  She then left while F.M. remained alone with the children.  At some point, F.M. got in the car with D.O. and Y.O. and returned with C.B. and N.O.  At the time of removal, C.B. was told that by leaving the children with F.M., she had demonstrated her previous pattern of conduct with violent men

and had misled the Department by assuring them "everything was ready."

*September 2011 Trial*

In September 2011, the case proceeded to a jury trial on TDFPS's fourth amended petition which sought termination based on Section 161.001(1)(D)(E), and (O) of the Texas Family Code. More specifically, the petition alleged that C.B.

> knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child (Section 161.001 (1)(D);
>
> engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child (Section 161.001 (1)(E);
>
> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child (Section 161.001 (1)(O).

TEX.FAM.CODE ANN. § 161.001 (1)(D)(E)(O)(West Supp. 2012).

The petition also alleged that termination is in the best interest of the child. TEX.FAM.CODE ANN. § 161.001 (2).

At C.B.'s request, the trial court instructed the jury that the February 25 mediated settlement agreement was a judicial admission by TDFPS that, as of that date, it was in the best interest of the children to be returned to their mother:

> The Texas Department of Family and Protective Services has made a judicial admission in this proceeding, that on February 25th, 2011, placement of the child [sic] with her mother is in the children's best . . . interest. You are instructed at [sic] that a judicial admission conclusively establishes that fact, as to the Texas Department of Family and Protective Services as of that date.

On September 19, 2011, the jury returned a verdict finding that TDFPS proved all three grounds for termination alleged by clear and convincing evidence and that termination was in the

best interest of the children. Finally, the jury granted sole managing conservatorship of one of the children, Y.O., to the intervener grandparents.

## EFFECT OF JUDICIAL ADMISSION AND JURY INSTRUCTION

We begin with the unusual posture of this case. During mediation, the Department and C.B. agreed to the entry of an order of "Monitor and Return" of all three children. The temporary order contains two applicable provisions.

> 2.7.     The Court further finds the following:
>
> 2.7.1.   Pursuant [sic] § 263.403, Texas Family Code, allows the Court to retain jurisdiction of this case 'if the Court renders a temporary order that (a)(1) **finds that retaining the jurisdiction under this section is in the best interest of the child;** (2) orders the department to return the child to the children's [sic] parent; (3) orders the department to continue to serve as temporary managing conservator of the child; and (4) orders the department to monitor the child's placement to ensure that the children are in a safe environment.' [Emphasis added].
>
> .     .     .
>
> 3.1.     Pursuant to § 263.403, Texas Family Code, the Court **finds that placing the children with there [sic] mother, [C.B.], while retaining jurisdiction, is in the best interest of the children** because the parties agreed to Return and Monitor during binding mediation. . . . [Emphasis added].

The Department maintains that the terms of the order were statutorily mandated and do not constitute a judicial admission of best interest. We disagree.

Generally speaking, Section 263.401 requires the court to dismiss a suit filed by the Department seeking termination of the parent-child relationship or appointment of the Department as a conservator of the child within one year of the date the court appointed the Department as temporary managing conservator. Section 263.403(a) provides:

> Notwithstanding Section 263.401, the court may retain jurisdiction and not dismiss the suit or render a final order as required by that section if the court renders a temporary order that:
>
> > (1) **finds that retaining jurisdiction under this section is in the best interest of the child;**

- 11 -

(2) orders the department to return the child to the child's parent;

(3) orders the department to continue to serve as temporary managing conservator of the child; and

(4) orders the department to monitor the child's placement to ensure that the child is in a safe environment.

[Emphasis added].  TEX.FAM.CODE ANN. § 263.403(a)(West 2008).  If such an order is entered, then the court must schedule a new trial date, not later than the 180th day after entry of the temporary order unless a trial on the merits has already begun.  Thus, paragraph 2.7.1 of the temporary order tracks the statute, finding that it is in the best interest of the children for the court to retain jurisdiction in hopes of family reunification.  Paragraph 3.1 is an entirely different animal because it specifically finds that as of the date of return, placing the children with C.B. was in their best interest.

There is abundant authority in Texas standing for the proposition that a court order regarding placement of children is *res judicata* of their best interest as of the date of the order. *Knowles v.* Grimes, 437 S.W.2d 816, 817 (Tex. 1969); *Wilson v. Elliott*, 96 Tex. 472, 73 S.W. 946 (1903); *Bates v. Tesar*, 81 S.W.3d 411, 436 (Tex.App.--El Paso 2002, no pet.).  Prior bad acts by a parent may not be dredged up thereafter as grounds for modification of permanent or temporary conservatorship.  There is one well recognized exception involving a continuous course of conduct.  *Wilson*, 73 S.W at 947 ("[E]vidence of prior conduct of either party cannot be introduced except to corroborate some evidence of similar conduct . . . since the original decree."); *Hollon v. Rethaber*, 643 S.W.2d 783, 784-785 (Tex.App.--San Antonio 1982, no writ).  Assume, for example, a parent is alleged to be an alcoholic at the time of a conservatorship order but the other parent nevertheless agrees that the alcoholic should be appointed a joint or sole managing conservator.  Any attempt thereafter to modify the terms or conditions of

conservatorship, or to terminate the alcoholic's parental rights, must be predicated upon a continuing course of conduct. The alcoholic's behavior before the date of the existing order is properly excluded from evidence. Given the philosophy that stability and permanency are critical to our children, the courts disallow evidence that purports to "go behind" the earlier order. But if there is evidence that the alcoholic's condition is worsening and his or her conduct is impacting the children, then it is relevant to both a finding of a material and substantial change in circumstances warranting modification, and to a statutory ground justifying termination. It is also highly relevant to a determination of best interest in modification or termination proceedings. *Dowell v.* Dowell, 276 S.W.3d 17, 22-23 (Tex.App.--El Paso 2008, no pet.).

Perhaps this is a long-winded way of saying that based on the jury instruction, the jury was required to focus on C.B.'s behavior between the date the children were returned to her and the date of re-removal. That time frame was three days. In this circumstance, relevant evidence of best interest would include a continuation of bad conduct, poor judgment, and violations of the conditions of return. Against this backdrop, we analyze the evidence. We preface our review with an unequivocal statement that the Department did not object to the jury instruction and we specifically decline to address its propriety as that question is not properly before us.

## PARENTAL TERMINATION

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West 2008). Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the child. *See id.* Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). As we have mentioned, C.B.

raises three issues, all of which focus on the sufficiency of the evidence to support the jury's determination regarding the best interest of the children under prong two.

The natural right of a parent to the care, custody, and control of their children, is one of constitutional magnitude. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982)(acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right.") Not only is a parent's interest in maintaining custody of and raising his or her children "paramount;" it is quite possibly the oldest fundamental liberty recognized by our courts. *See In the Interest of M.S., E.S., D.S., S.S., and N.S.*, 115 S.W.3d 534, 547 (Tex. 2003)(noting that Texas courts recognize that "a parent's interest in maintaining custody of and raising his or her child is paramount"); *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000)(in discussing the constitutional stature of parental rights, the United State Supreme Court said, "the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *see also In re M.S.*, 115 S.W.3d at 549 ("Termination of parental rights is traumatic, permanent, and irrevocable."). Although parental rights are of constitutional magnitude, they are not absolute. *In the Interest of C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

### *Burden of Proof*

Because of the elevated status of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from the

preponderance of the evidence to clear and convincing evidence.[9] *Santosky*, 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick*, 685 S.W.2d at 20-21. *See In re M.S.,* 115 S.W.3d at 547 and *In the Interest of D.S.P. and H.R.P.*, 210 S.W.3d 776, 778 (Tex.App.--Corpus Christi 2006, no pet.)(cases recognizing that involuntary termination of parental rights is a drastic remedy which divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.); *see also In the Interest of B.L.D. and B.R.D.,* 113 S.W.3d 340, 353-54 (Tex. 2003)(noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing evidence).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX.FAM.CODE ANN. § 101.007 (West 2008); s*ee In the Interest of J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007)(contrasting the standards applied in termination proceedings and the standards applied in modification proceedings); *In the Interest of C.D. and K.D.*, No. 02-10-00070-CV, 2011 WL 1743688, at *4 (Tex.App.--Fort Worth May 5, 2011, no pet.). This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *In the Interest of D.T.*, 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied)(op. on reh'g). Although the proof must be more than merely the greater weight of the

---

[9] This heightened standard is likewise statutorily mandated. *See* TEX.FAM.CODE ANN. § 161.001 (West Supp. 2012)(stating, "The court may order termination of the parent-child relationship if the court finds **by clear and convincing evidence** . . . . [Emphasis added].).

credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

### *Standards of Review*

We review a trial court's ruling on a motion for directed verdict just as we do a claim of legally insufficient evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). Accordingly, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.*, 96 S.W.3d at 266. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.*; *In re J.F.C.*, 96 S.W.3d at 266. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266. A legal sufficiency or no evidence point will only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher*, 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

Finally, the sufficiency standards of review are explained in *In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002) and *In re C.H.*, 89 S.W.3d 17 (Tex. 2002). Through them, and when addressing a factual sufficiency complaint, we are told to determine whether, after assessing the entire record, the evidence permits a fact finder to reasonably form a firm belief or conviction about the truth

of the State's allegations. *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. Unlike the situation wherein the legal sufficiency of the evidence is in question, our focus is not simply upon the undisputed evidence that supports the verdict, but the disputed evidence as well. *In re J.F.C.*, 96 S.W.3d at 266. Implicit in the standard is our obligation to accord the fact finder the deference needed for it to fulfill its role. *In re C.H.*, 89 S.W.3d at 25-26. Furthermore, if the evidence is factually sufficient, then, it is also legally sufficient. This is so because, logically, there cannot be "no evidence" of record if the record contains enough evidence to enable the fact finder to reasonably form a firm belief or conviction as to the existence of pivotal facts.

### *Best Interest of the Children*

A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of R.F.*, 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). However, there is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *Swate v. Swate*, 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet denied). The Texas Supreme Court has enumerated certain factors which should be considered: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976)("the *Holley* factors"). Also, permanence is of paramount importance in considering a child's present and future needs. *Dupree v. Texas Department of Protective & Regulatory Services*, 907 S.W.2d 81, 87 (Tex.App.--Dallas 1995, no pet.).

- 17 -

In Issue One, C.B. complains that the trial court erred in failing to enter a directed verdict in her favor. A directed verdict is a procedural device to ask the court to render judgment without submitting a charge to the jury because there is nothing for a jury to decide. A trial court may direct a verdict when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery. *Prudential Insurance Company of America v. Financial Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

After the Department rested, counsel for C.B. moved for a directed verdict:

> Your Honor, because of the judicial admission of best interest as of February 25, we now have a really truncated evidentiary picture for the Court with respect to sufficiency of evidence as a matter of fact, as a matter of law, from February 25 to the -- to this date. And so I move for directed verdict on the second prong of what the jury would find, in that, no jury could find, as a matter of fact or as a matter of law, there is sufficient evidence to terminate parental rights on the basis of best interest. Given that we stand on the shoulders of a judicial admission from the Department of best interest to refer return of the children.

The trial court denied the motion.

Initially we note that C.B. devotes a significant portion of her appellate brief to discussing the circumstances of the March 2011 removal of the children. Specifically, she addresses the enforceability of terms in the mediation agreement and alleged due process violations. To the extent C.B. attempts to argue anything outside the scope of what was actually contained in the motion for directed verdict, these issues are not preserved. All that remains, then, is C.B.'s claim that the trial court erred in denying her motion for directed verdict because the evidence was insufficient for any rational jury to terminate parental rights on the basis of best interest. Issues Two and Three relate to the sufficiency of the evidence to support the jury's finding that termination was in the children's best interest. Based on the applicable stands of review set forth below, we address these three issues together.

## *Analysis of <u>Holley</u> Factors*

We focus our attention on C.B.'s continuing course of conduct and her failure to comply with the terms of the settlement agreement. She has a history of leaving the children with one of her boyfriends or her mother, often to go to Juarez.[10] E.E. testified that he would help with the children when C.B. would go to Juarez to party. C.B. testified that sometimes she'd be gone for a couple of hours and sometimes weeks.

The evidence at trial demonstrated that C.B. repeatedly entered into relationships with violent men, even dating both D.L. and E.E. a second time after each had assaulted her and been incarcerated. Not only had the children witnessed the domestic violence, but N.O. had also been the victim of such aggression. Time and again, C.B. associated with known criminals and allowed these men to be around her children. This pattern of behavior is particularly relevant where, as here, the children were removed after being left in the care of one of C.B.'s boyfriends. C.B. was given a final chance to care for her children as a result of the mediated settlement agreement. Yet only three days later, her children were in the care of boyfriend, and she was not around. While her testimony wavered at times, C.B. admitted that she knew of F.M.'s prior convictions, including a conviction for domestic assault. She also knew that TDFPS had not completed a background check on F.M. and that only people TDFPS approved could be around her children. C.B.'s pattern of leaving her children with unapproved men, (who have inevitably been convicted of domestic assault at one time or another) shows a continuous failure to put the safety and welfare of her children first. *See In the Interest of R.F. and L.C.*, 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.)(termination was in the children's best interest given the mother's repeated relationships with men who were physically abusive and had arrest records).

---

[10] There was also testimony that C.B. left N.O. with his Uncle R.L. (brother of D.L.) while she was in Juarez. R.L. dropped N.O. off without waiting to see if anyone was home. C.B. testified that this was normal and how they did things. The police were eventually called her because N.O. had been dropped off and no one was home.

C.B. also violated the conditions of return. She agreed to enroll her children in day care and to provide transportation for them to school and therapy sessions. In fact, she told the Department all plans were in place before the children were returned to her. Yet she enrolled only one child in day care. And despite knowing the restrictions on caregivers, she relinquished transportation and after school care to her mother and F.M.

C.B. testified that she is ready and able to take care of her children, including dealing with N.O.'s special needs. She discussed plans to put N.O. in sports and allow him to express himself through his art. She planned to focus on education and the importance of reading with all of the children and that she planned to continue to educate herself as well. Yet at the time of trial, C.B. was not employed and was two weeks away from being evicted from her housing. With respect to her employment history, C.B. testified that in 2009 she worked for about two days at a place called Hiney's. Then, from February or March 2010 until June 2010, she worked for Bilingual Research Service. From May until September or October 2010 she worked for Extreme Tattoos. She had been terminated from her last job a few weeks earlier on August 29, 2011 but stated that she was "using [her] time wisely." She also testified that she has a house in Sunland Park, New Mexico, where she and the children can live once she is evicted. C.B. has some belongings at the home and spends weekends there, but that she hasn't actually moved in because the terms of her probation and of her agreements with the Department do not allow her to leave the State of Texas. She admitted that the house is owned by F.M.'s father, leaving the jury to infer that she planned for F.M. to be a continuing presence in the lives of her children.

Ms. Maldonado, a licensed professional counselor, has worked with all three of the children. She has been seeing N.O. approximately every two weeks since October 2010. When she began seeing him and asked about his mother, he would "wring his fingers or his hands together, and then answer, but very superficial answers." This behavior lasted six or seven

months, but by the time of trial, he was more open to talking about his mother. N.O. likes living in the house with his foster family but he doesn't like the rules of foster care. He needs a lot of one-on-one time, a lot of encouragement and praise, and a lot of good role model behavior. She described N.O. as "very intelligent." and said he has "good insights." But "[h]e's impulsive, but with enough behavior modification -- which is part of that -- enough problem-solving skills training, he would be able to control those impulses."

Ms. Maldonado has been seeing Y.O. since March 2011 when he began living in the Martinez foster home. She described him as a "very confident, very lovable compassionate child." While he has expressed a desire to live with his mother, he has "indicated some concern with [F.M.] . . . . He's a little afraid of him."[11] Y.O. has voiced some fear of his grandfather because his grandfather has yelled at him, but he loves his grandmother who spoils him. Y.O. likes spending time with his father but does not want to live with him.

Ms. Zumwalt, the CASA advocate, has visited Y.O. six times. She testified that Y.O. will have a bright future once he is established but he needs permanency and stability. "He needs to know that he's safe and he's not afraid anymore." Zumwalt recommended that Y.O. be adopted by his paternal grandparents.

D.O. was only three-years-old at the time of trial and her desires varied because of her young age. Zumwalt recounted that D.O. does not want to live with "mommy" and sometimes says she does not want to live with "Grandmommy L," her paternal grandmother. D.O. is just starting to explore and needs to be in preschool where she can interact with other children. Ms. Zumwalt described her as "a typical three-year-old" who is "very active" and "bright." She recommended that C.B.'s parental rights be terminated based on C.B.'s past and her concern about C.B.'s ability to parent D.O. in the future, concluding, "I don't believe she can."

---

[11] According to Maldonado, N.O. and Y.O. both identified F.M. as their mother's boyfriend.

Despite hearing C.B.'s testimony at trial that she has been sober for five months, Zumwalt had no evidence to corroborate C.B.'s sobriety claim, and was unwilling to gamble with the children's future. In considering the best interest of the children, Zumwalt opined that C.B. (1) has not been around the children for the past two years; (2) has not demonstrated good parenting skills, especially during the thirteen years that she had N.O.; (3) has not demonstrated that she is a good parent; (4) has not been truthful; and (5) has not offered any explanations or excuses that would change her opinion. With respect to adoption, Zumwalt related that N.O, Y.O., and D.O. are "just precious children" and are "very adoptable."

While each of the children expressed at least some desire to live with their mother, a child's desire to remain with a parent is only one factor to consider among many. *See Yonko v. Department of Family and Protective Services*, 196 S.W.3d 236, 245 (Tex.App.--Houston [1st Dist.] 2006, no pet.); *In the Interest of W.S.M.*, 107 S.W.3d 772, 773 (Tex.App.--Texarkana 2003, no pet.)(cases noting that where the evidence of the parent's failures is not overwhelming, the desires of the child weigh against termination of parental rights, but also noting that love for a parent cannot be ignored as a reflection of the parent's ability to provide for the child's emotional needs.)

We fully recognize that C.B. is herself a victim of abuse but the cycle has become self-perpetuating. *See In re R.F.*, 115 S.W.3d at 812 (holding evidence supported the jury finding that termination was in the children's best interest despite the mother's own physical and sexual abuse as a child). She has made great strides toward acknowledging her mistakes, but unfortunately the struggle has been met with lapses in judgment and relapses in conduct. These children have been involved in repeated Department intervention since 1998.

## CONCLUSION

Applying the clear and convincing evidence standard, we conclude that the evidence was sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations that termination was in the children's best interest. We overrule Issues One and Two. In considering C.B.'s factual sufficiency challenge, we have assessed the entire record to determine whether the evidence permits a fact finder to reasonably form a firm belief or conviction about the truth of the State's allegations. *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. Unlike a legal sufficiency review, our focus is not simply upon the undisputed evidence that supports the verdict, but the disputed evidence as well. *In re J.F.C.*, 96 S.W.3d at 266. Implicit in the standard is our obligation to accord the fact finder the deference needed for it to fulfill its role. *In re C.H.*, 89 S.W.3d at 25-26. For all of the reasons stated above, we conclude that the evidence is also factually sufficient. We overrule Issue Three and affirm the trial court's judgment.

June 19, 2013

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.
Antcliff, J., not participating

- 23 -