

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-15-00379-CV

**IN THE INTEREST OF A.T.L.**, a Child

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-00966
Honorable Antonia Arteaga, Judge Presiding

Opinion by: Sandee Bryan Marion, Chief Justice

Sitting: Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Marialyn Barnard, Justice

Delivered and Filed: October 28, 2015

AFFIRMED

This is an appeal from the trial court's order terminating appellant's parental rights to his

daughter, A.T.L., who was born on February 5, 2014.[1]  In three issues, appellant challenges the

sufficiency of the evidence in support of the constructive abandonment, failure to comply with a

court order, and best interest grounds on which his parental rights were terminated.  *See* TEX. FAM.

CODE ANN. § 161.001(1)(N), (O), (2) (West 2014).  We affirm.

## BACKGROUND

At the beginning of the termination hearing, the attorney for the Texas Department of

Family and Protective Services (the "Department") noted appellant was not named on his

---

[1] The mother voluntarily relinquished her parental rights.  A.T.L. was about fourteen months old at the time on the termination hearing.

daughter's birth certificate nor had he officially acknowledged being the child's father. The trial court later adjudicated him to be A.T.L.'s father. Because appellant was incarcerated at the time of the termination hearing, he participated telephonically.

Teresa Gomez, the Department's family-based worker, testified the Department first received a referral on the family in March 2014 for sexual abuse. When the Department went to the family's house, they observed the mother, her two children,[2] and several other roommates all living in a "deplorable condition," which included several dogs and cats, snakes, and weapons. Because the weapons were accessible to the elder child, both children were removed from the home.

Gomez said that at the time of the removal, the Department was given only appellant's date of birth, but because some of the numbers were transposed, the Department could not locate him. Gomez said the mother provided no other information about appellant, except that she thought he might be incarcerated.

Martha Suarez, the Department caseworker for the entirety of the case, testified that she believed termination was in A.T.L.'s best interest because appellant could not provide a safe and stable home, he admitted to using heroin and cocaine, he failed to support the child, and he had not tried to visit the child despite having access to her. Suarez said appellant also had "bouts" of homelessness and untreated mental health issues. She did not believe he had made any positive changes during the pendency of the case.

Suarez said both children had been in two foster homes, and had been in the most current home since about October 24, 2014. The current foster home is also the potential adoptive home for both children. Suarez said the Department attempted to place the children with family members

---

[2] One of the children was A.T.L., and the other child was A.T.L.'s older sister who was about five years old at the time of the termination hearing. A.T.L.'s older sister is not the subject of this appeal.

but was unable to because either the family member declined a home study or had a criminal history. Suarez admitted the foster parents would continue to care for A.T.L. during appellant's incarceration if the court decided to not immediately terminate appellant's parental rights.

Appellant, who was incarcerated for possession of less than one gram of methamphetamine, testified telephonically from jail. Appellant said he was first contacted by the Department in August 2014 and he signed his service plan on September 25, 2014.[3] He was arrested and confined on October 14, 2014, and, at the time of the termination hearing, had served seven months of his sixteen-month sentence. Appellant testified he would be released as early as November 2015 or as late as February 2016.[4] Appellant had not yet been arrested when the Department took custody of A.T.L. on or about April 23, 2014. Between the time of signing his service plan and the beginning of his incarceration, appellant did not engage in any of the services required under the plan.

When Suarez was asked why the court should immediately terminate appellant's parental rights rather than wait a few more months for his release, Suarez replied that appellant "had an opportunity. He decided not to and he engaged in criminal activity." She said that when she met with appellant about his service plan in September 2014, appellant told her "that doing the services was not imperative to him at that point. [He had just fallen off a roof at work and he was applying for Social Security.] And that [the plan] was not important to him at that point because he wanted to get himself situated first." Suarez said appellant would still be incarcerated by the time the court's eighteen-month dismissal date occurred in October 2015. When asked why the Department could not continue its conservatorship and seek termination at a later date if necessary, Suarez

---

[3] The petition was filed on April 24, 2014.

[4] The termination hearing was conducted on May 19, 2015.

replied that both girls needed stability and they currently are in a stable home.[5]  Suarez also believed that even if the Department continued with conservatorship, there was no guarantee appellant would have made enough progress.

Appellant denied having a substance abuse problem, contending he was only a casual drug user and he could stop using drugs when he needed to stop.  He admitted using heroin.  He said he was in possession of the methamphetamine when he was arrested because he intended to deliver the controlled substance to another person.  But, he also said he does not often deliver drugs.  Appellant testified about other convictions, and exhibits evidencing the following convictions were admitted: (1) a November 2005 judgment for assault-family-2nd offense; (2) a June 2009 judgment for possession of a controlled substance; (3) a January 2012 judgment for theft of a vehicle; (4) an April 2014 judgment for forgery of a check; and (5) a December 2014 judgment for possession of a controlled substance.  When asked what assurances he could give the court that he would not return to criminal activity upon his release from jail, appellant responded: "I know I'm not going back to being a criminal no more [sic] because it's not worth it.  I'm 33 years old."

Appellant said he had just started a four-month program, while incarcerated, called Turning Point, which he would complete by August 25, 2015.  He said the program involves classes about drug and alcohol abuse and parenting, and lasts about four hours a day, Monday through Friday.  He is also taking a Christian class, a parenting class, and an anger management class.  He said he has not completed any of the classes, because the program lasts four months and he has only been in the program for one month because he had been on a wait list to start the program.  Appellant has been diagnosed as having bipolar disease, schizophrenia, depression, and anxiety, but he takes

---

[5] Suarez did not indicate A.T.L. had any health issues.  However, she stated A.T.L.'s older sister (born February 22, 2009), is in play therapy and receiving counseling, and the foster parents have been provided with cognitive behavioral and stress reduction strategies and psychoeducational material.

medication for only his bipolar disease. Upon his release, appellant will have no medical insurance.

Although appellant has photographs of his daughter, he said he has never physically seen her because the mother did not want him to be around the child and would not tell him the child's location. Appellant said he offered to provide financial help, but the mother did not want his help. He said that before his incarceration, he offered to pay the mother $300 a week because he had a job, but the mother said she wanted nothing from him and A.T.L. did not need him. Appellant said he wanted to remain A.T.L.'s father, and he wanted her to remain in her foster home until his release. After his release, appellant planned to return to his former job or work for a friend of his at a landscaping company. Appellant admitted to arguing with A.T.L.'s mother, but he denied ever hitting her or engaging in any domestic violence. He also denied telling Suarez he fell off a roof or that he did not want to work his services. Appellant said he told Suarez that if the mother was not doing her service plan, then he knew he had to do something.

Finally, A.T.L.'s mother, Karen L., testified. She said "there were times where [sic] [appellant] was yelling and screaming. And he got to the point where he got so angry, he did pull a knife out on me in front of [her other daughter]." Karen said that after she became pregnant with A.T.L., appellant's violence started to get more out of control, and he once tried to suffocate her with a pillow, again in front of her other daughter. She said her other daughter is "terrified" of appellant. Based on his behavior around her eldest daughter, Karen did not believe appellant knew how to act around children and did not know how to be a father figure. Karen admitted she hid A.T.L. from appellant because the children were afraid of him and she did not know how appellant would react to A.T.L. She said appellant has offered, but not actually provided, any support for A.T.L.

Karen believed it was in the best interest of both of her children to be adopted by their foster parents. As to appellant, Karen said she refused his offer of help because she did not want him anywhere near herself or her children. She said appellant knew immediately that she was pregnant, but she left him when she was about nine weeks' pregnant. She admitted to "a lot of hard feelings" between the two of them. Karen believed that, even with appellant receiving help for his mental issues, he would not change.

## STANDARD OF REVIEW

In proceedings involving the termination of parental rights, the State must establish one of the grounds listed under subsection (1) of section 161.001 of the Texas Family Code ("the Code") and prove that termination is in the best interest of the child. TEX. FAM. CODE § 161.001; *C.B. v. Tex. Dep't of Family and Protective Servs.*, 440 S.W.3d 756, 767 (Tex. App.—El Paso 2013, no pet.). A termination decision cannot be based on only one of the grounds listed under subsection (1) of section 161.001 of the Code; best interest must also be established. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.3d 531, 533 (Tex. 1987); *C.B.*, 440 S.W.3d at 767. Additionally, a court's decision to terminate a parent's rights to his or her children must be supported by clear and convincing evidence. *Id.* § 161.206(a); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re E.A.G.*, 373 S.W.3d 129, 140 (Tex. App.—San Antonio, 2012, pet. denied). "Clear and convincing evidence" is defined as "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see J.O.A.*, 283 S.W.3d at 344; *E.A.G.*, 373 S.W.3d at 140. This heightened standard of review is required because termination of a parent's rights to his or her child results in severe and permanent changes to the parent-child relationship, implicating due process. *E.A.G.*, 373 S.W.3d at 140.

In evaluating the evidence for legal sufficiency, we must determine whether the evidence is such that a fact finder could reasonably form a firm belief that the termination was in the best interest of the child. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We view all the evidence in the light most favorable to the trial court's finding and judgment, and we resolve any disputed facts in favor of the trial court's findings so long as a reasonable fact finder could have done so. *Id.* We also disregard all evidence a reasonable fact finder could have disbelieved and consider undisputed evidence even if such evidence is contrary to the trial court's findings. *Id.* In sum, we consider evidence favorable to termination if a reasonable fact finder could, and we disregard contrary evidence unless a reasonable fact finder could not. *Id.* We may not weigh a witness's credibility as it depends on the appearance and demeanor of the witness, and such issues are within the domain of the trier of fact. *Id.* Even if credibility issues are found in the appellate record, we must defer to the fact finder's reasonable determinations. *Id.*

In evaluating the evidence for factual sufficiency, we give due deference to the fact finder's findings and avoid substituting that judgment for our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction [in the truth of its finding], then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). Just as in a legal sufficiency review, the determination of a witness's credibility and demeanor is made by a trier of fact, and we cannot second guess the fact finder's resolution of factual disputes. *H.R.M.*, 209 S.W.3d at 109.

## CONSTRUCTIVE ABANDONMENT

On appeal, appellant challenges the sufficiency of the evidence in support of the trial court's finding that he constructively abandoned A.T.L. A court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and: (i) the department or authorized agency has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment . . . ." TEX. FAM. CODE § 161.001(1)(N). Appellant only challenges the sufficiency of the evidence to support the reasonable efforts and significant contacts elements.

A family service plan is designed to reunify a parent with a child who has been removed by the Department. *In the Interest of A.Q.W.*, 395 S.W.3d 285, 288 (Tex. App.—San Antonio 2013, no pet.). Implementation of a family service plan by the Department is ordinarily considered a reasonable effort to return a child to its parent. *Id.* Appellant relies on this court's opinion in *A.Q.W.* for his argument that the Department did not make reasonable efforts to return A.T.L. to him. The State counters that this requirement should be inapplicable because appellant was incarcerated after the termination proceedings began.

As to the State's argument, this court noted in *A.Q.W.* that "the requirement that the Department has made reasonable efforts to return the child to the parent may be inapplicable when the parent is incarcerated." *Id.* However, reasonable efforts to return a child to a parent "under section 161.001(1)(N)(i) does not necessarily mean the child must be physically delivered to the incarcerated parent." *In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.) (disagreeing "with the proposition that § 161.001(1)(N) 'was never intended to apply to someone'

in prison merely because the parent is in prison"); *In the Interest of V.D.A.*, 14-14-00561-CV, 2014 WL 7347776, at *3 (Tex. App.—Houston [14th Dist.] Dec. 23, 2014, no pet.) ("Imprisonment, standing alone, does not constitute constructive abandonment.").

In *A.Q.W.*, we examined whether the Department had made a reasonable effort to return the child to his parent and concluded it did not based on the circumstances presented in that case. The Department's petition identified A.Q.W.'s mother's husband as the father and appellant as the "alleged" father. Appellant was considered the child's "alleged" father because he was not named on the birth certificate and the child's mother was married to another man. The trial court ordered DNA testing to determine parentage on October 11, 2011; DNA testing was performed on November 17, 2011; and DNA testing was completed and filed on December 6, 2011 showing appellant to be A.Q.W.'s father. The termination hearing commenced on January 6, 2012. We held the evidence was legally insufficient to support a finding that the Department made a reasonable effort to return A.Q.W. to his father because the appellant was not confirmed as A.Q.W.'s father until approximately thirty-six days before the termination hearing; he did not receive his service plan until thirty-four days before the hearing; during this entire time he was incarcerated; and the record contained no evidence appellant was provided with a reasonable opportunity to enroll in, much less complete, any of the requirements that he could have complied with while incarcerated. *Id.* at 290.

Appellant asserts the evidence is insufficient in this case for the same reasons the evidence was insufficient in *A.Q.W.* He alleges he was confirmed as A.T.L.'s father during the May 2015 termination hearing; he signed his plan on September 25, 2014; he was incarcerated approximately three weeks later; and he remained incarcerated until the termination hearing. According to appellant, there is no evidence in the record that he was provided a reasonable opportunity to enroll in, much less complete, any of his plan requirements.

The facts in this case are distinguishable from those in *A.Q.W.* Appellant was adjudged A.T.L.'s father at the May 19, 2015 termination hearing, but he knew Karen was pregnant with his child and was aware of A.T.L.'s birth in February 2014. Although there appears to be no dispute that Karen denied him any contact with A.T.L., nothing in the record indicates appellant took any action to contact or gain access to his child in the more than eight months between her birth and his incarceration, or during the period of his incarceration. Although appellant denied telling Suarez he did not want to work his services, again, we must defer to the trial court's reasonable determinations on credibility issues. Suarez testified appellant told her doing the services was not imperative to him and the plan was not important to him at that point in time because he wanted to get himself situated first. Instead, appellant was arrested three weeks later.

Also, the Department attempted to place A.T.L. with family members but was unable to because either the family member declined a home study or had a criminal history. *See In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.) (applying the first prong of subsection N to an incarcerated parent, reasoning that an incarcerated parent may leave the child with a spouse or relative, and the child could accordingly be returned from the Department's custody); *see also In the Interest of K.J.T.M.*, No. 06-09-0104-CV, 2010 WL 1664027, at *3-4 (Tex. App.—Texarkana April 27, 2010, no pet.) (citing Department's efforts, "although futile," to place child with relatives as supporting finding of reasonable efforts to return child to incarcerated parent).

We conclude the Department's preparation and administration of a service plan, in conjunction with its consideration of relative placements, supports the trial court's finding that the Department made reasonable efforts to return the child to appellant.

Appellant also challenges the sufficiency of the evidence in support of the finding that he did not regularly visit or maintain significant contact with A.T.L. because, according to appellant,

there is no evidence the Department arranged any parent-child visits or that appellant missed any visits prior to his incarceration. Incarceration does not render "it impossible for the parent to maintain significant contact with the child." *In re D.S.A.*, 113 S.W.3d at 574. There is no evidence appellant took any action to have contact with his child during the period of his incarceration. Also, there is no evidence appellant took any action to contact or gain access to his child in the more than eight months between her birth and his incarceration. On this record, we conclude the evidence supports the trial court's finding that appellant did not regularly visit or maintain significant contact with A.T.L.

Based on the above, we hold the trial court's decision to terminate appellant's parental rights under subsection (N) of section 161.001 is supported by clear and convincing evidence.[6]

## BEST INTEREST

A trial court may order termination of the parent-child relationship only if the court finds by clear and convincing evidence one or more statutory grounds for termination and that termination is in the child's best interest. TEX. FAM. CODE § 161.001(1), (2); § 161.206(a). There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, when the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a). In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors set forth in Family Code section 263.307(b).

---

[6] Only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *See In the Interest of E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Because we hold the evidence supports the termination of appellant's parental rights under subsection (N) of section 161.001(1), we need not address whether the evidence is sufficient to support a finding under subsection (O).

We also apply the non-exhaustive *Holley* factors to our analysis. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). And finally, evidence that proves one or more statutory grounds for termination may constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). A best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest. *Id.*

In this case, there is evidence that appellant (1) has an unstable residency status, (2) committed acts of domestic violence in the presence of A.T.L.'s older sister, (3) committed a variety of crimes over the years for which he was incarcerated, (4) used heroin and cocaine, (5) did not visit or support A.T.L. at a time when he was free to do so and allegedly employed, and (6) failed to meet the requirements of his family service plan. There is also evidence that the current foster parents (1) want to adopt A.T.L. and her sister, (2) have provided a stable and safe environment for both girls, and (3) have attended to the medical needs of the older sibling. The older sibling has also expressed a fear of appellant. From these facts, one can reasonably deduce that appellant lacked the ability, skills, or desire to care for A.T.L.; that A.T.L. needs a stable home environment which appellant could not or would not provide; and that his acts or omissions indicated the lack of a proper parent/child relationship. In short, we conclude the evidence permits a reasonable factfinder to form a firm conviction and belief that termination of the parent/child relationship was in A.T.L.'s best interest.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's Order of Termination.

Sandee Bryan Marion, Chief Justice