# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-13-00845-CV

**J. C. C., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. D-1-FM-12-000387, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

In December 2013, following a jury trial, the trial court terminated appellant J.C.C.'s parental rights to his four-year-old daughter N.C. and his two-year-old son J.C.[1] J.C.C. appeals, contending that the evidence is legally and factually insufficient to support the jury's finding that termination is in the children's best interest. We affirm the trial court's decree of termination.

### Factual Summary

In October 2011, the Department received a report that the children were being neglected by J.P.[2] J.P. had left the children with a friend and, three days later, J.P.'s mother had not

---

[1] The children's mother, J.P., did not appeal the termination of her parental rights. J.C.C. and J.P. had an on-again, off-again relationship for a number of years, and J.P. admitted at trial that she was addicted to several drugs, had used drugs for years, and was currently struggling to stay clean but did not have her addiction under control. J.P. testified that she had not seen the children in about two years and that it was best for the children if she was not involved in their lives.

[2] J.P. and J.C.C. were no longer together in October 2011.

been able to locate her. J.C.C. took custody of the children two days after the referral, and a Department caseworker met with J.C.C. and at that time had no concerns about the children's well-being or safety. The children eventually ended up back in J.P.'s custody after spending time with J.C.C., his mother, J.P.'s mother, and C.P., their maternal aunt. In November 2011, J.C.C. informed the Department that he had "completed his services in the previous case"[3] and that he would not participate in services if "[J.P.] had primary custody and could pick up [N.C.] and [J.C.] from him." He also told a caseworker that "he does not have to work services since this case has nothing to do with him." In February 2012, after caseworkers were unable to reach J.P., the Department was given conservatorship of the children. J.C.C. was in jail at that time and said he had not seen the children since November 2011. The children were first placed with C.P. and later moved to their current foster family when C.P. and her husband decided they could not afford to raise the children in addition to their own teenaged children.

In May 2012, after his release from jail, J.C.C. began working his services, and in early July 2013, over the Department's objections, the trial court returned the children to J.C.C. for a monitored return, finding "good cause" for the return. However, one month later, J.C.C. and J.P. got into an altercation apparently initiated and escalated by J.P., and the Department took custody of the children again and decided to seek termination of J.C.C.'s rights. The children were returned

---

[3] N.C. was born with cocaine in her system and was initially placed with C.P. According to the Department's affidavit supporting its petition for removal, J.C.C. refused to work his services in that case as well. N.C. was returned to J.P.'s care "by court mandate" in July 2010, several months before J.C. was born, and her return was conditioned on J.C.C. moving out of the home. J.C.C. was granted limited access and visitation.

to their foster parents, who hope to adopt the children. Department witnesses testified that adoption by the foster parents was the Department's plan for the children.

Police witnesses testified that undercover officers and informants bought cocaine, methamphetamine, and crack cocaine from J.C.C. on several occasions in 2008 and once in early 2012. Although he initially denied having been convicted of any crimes, J.C.C. admitted that he had been convicted of delivery of a controlled substance. He also admitted that he sold drugs but insisted he had only acted as a middle man. J.C.C. said he had been arrested for drug possession or delivery ten to twelve times but tried to change his lifestyle when N.C. was born. Although J.C.C. denied that he knew J.P. was a drug user and addict, the evidence indicates that her drug use was not a secret and that the children were often left in her care while she was using drugs.

While this case was pending, J.C.C. and J.P. were twice arrested for domestic abuse. Police officers saw injuries on J.P. and J.C.C. after those two incidents, but J.C.C. was released both times without being charged. Several witnesses testified that J.P. told them J.C.C. had been abusive while they were dating, but J.P. and J.C.C. denied at trial that abuse had occurred. J.C.C. admitted that during their relationship, he and J.P. had fought and wrestled, he had pushed her, and he had destroyed her things, but he denied striking her.

Psychologist William Dubin testified that J.C.C. had a "borderline intellect level," could not read well, and had a tendency to become frustrated and give up. Dubin believed that J.C.C.'s deficiencies in his "general competence and judgment" would impair his parenting abilities and that he needed help to become more aware of the children's physical and emotional needs and to learn to parent effectively and control his impulses. Dubin believed that allowing J.C.C. to parent without external supervision "would be a danger to the children."

3

After the children were removed, J.C.C. did not contact the children's caretakers or therapist to enquire about their progress or well-being, nor did he provide financial assistance or tangible items like diapers or toys. Further, when the children were removed from J.C.C.'s care after the monitored return, he told the Department that they were with his sister, who was approved for child care by the Department, when they were instead with his mother, who had not been approved by the Department and who apparently did not believe J.C.C. was the children's biological father.

C.P. testified that when the children were placed with her in early 2012, they lacked a bedtime routine, were rambunctious, and wanted only to eat sugary food. Further, J.C. had only received one immunization. J.C. also suffers from post-traumatic stress disorder, despite being only two years old at the time of trial, and is speech delayed. Because of his speech delays, J.C. was initially aggressive with children his age. C.P. testified that J.C.'s speech was so delayed that she brought him to have his hearing tested, fearing that he might be deaf. The children's foster parents are teachers specializing in deaf education and their foster father is deaf. J.C. has been taught sign language to help him communicate, which has reduced his aggression toward other children.

The children's foster mother testified that when the children first came to live with her family, N.C. had separation issues and J.C. seemed "shell-shocked." Before their visitations with J.C.C., the children's anxiety and acting out would increase, N.C. would exhibit oppositional behavior, and J.C. would cry more. After visits, the children were usually hyper, unhappy, and hard to soothe for about a day. As the frequency of their visitations with J.C.C. increased, both children began to suffer from nightmares, their foster mother sometimes had to sleep with her hand on N.C.'s back for comfort, and J.C. regressed in toilet training, sign language, and language skills. When it

was time for the children's monitored return to J.C.C., J.C. was very confused and upset, and N.C. became very angry and screamed that she did not want her things moved to J.C.C.'s home.

When the children returned to their foster home, they threw themselves into their foster parents' arms. However, despite being happy to have returned to their foster home, N.C. lashed out in anger at her foster parents, and J.C. seemed "more angry, a lot more quick to get mad, hit, get a little bit frustrated . . . . There was a lot of anger." They have since settled back in, and N.C.'s separation anxiety has eased. C.P., the children's therapist, their foster parents, and J.B., their maternal grandmother, testified that the children are happy, thriving, and well-bonded with their foster parents. J.C. has "come out of his shell" and is particularly close to his foster father. C.P. and J.B., with whom the foster parents have developed and maintained a relationship, believe the home is a good fit for the children. J.B. testified that since being placed in the foster home, the children feel happy and secure and know they are safe.

The Department caseworker testified that J.C.C.'s rights should be terminated because "[t]here's an extensive history of [J.C.C.] using drugs, dealing drugs. It's been obvious through this trial domestic violence, continued domestic violence. Even when we were very close to returning the children to his care, just inconsistencies with his—with his comments, his stories, his contact with [J.P.]." She said that although J.C.C. worked his services in this case, "there were moments, there were actions that he—he did not take himself out of those situations."

**Discussion**

In his briefing, J.C.C. insists that the trial court, by stating that there was good cause to return the children to his care in July 2013, made a "judicial admission" that the return was in the

5

children's best interest, and that our "best interest analysis should be limited to the facts that occurred from the date that the monitor[ed] return started to the date of the re-removal or the date of trial." To support this contention, he cites to *C.B. v. Texas Department of Family and Protective Services*, No. 08-11-00286-CV, 2013 Tex. App. LEXIS 7546 (Tex. App.—El Paso Jun. 19, 2013, no pet.). However, *C.B.* does not control our analysis here.

In *C.B.,* the Department and C.B. participated in mediation and entered into a settlement agreement. Pursuant to the settlement agreement, the trial court entered a monitored return order specifically stating that returning the children to their mother was in the children's best interest. *Id.* at *11. The trial court also included in its jury charge an instruction, requested by C.B. and not objected to by the Department, that the Department had "made a judicial admission" that placing the children with her was in the children's best interest as of the date of their return. *Id.* at *16. Thus, the court of appeals noted, the case had an "unusual posture," and the jury was "required to focus on C.B.'s behavior between the date the children were returned to her and the date of re-removal." *Id.* at *17, 20-21. In contrast, the monitored return order in this case did not include any language to the effect that placement with J.C.C. was in the children's best interest, there was evidence that the Department was opposed to the return, and there was no jury instruction or other judicial admission related to the children's best interest. Thus, *C.B.* and its "unusual posture" are distinguishable.

Further, the *C.B.* court stated that "[t]here is abundant authority in Texas standing for the proposition that a court order regarding placement of children is res judicata of their best interest as of the date of the order." *Id.* at *19. However, the cases cited for that proposition involved final

6

orders or decrees rendered in child custody or divorce proceedings. *Id.* (citing *Knowles v. Grimes*, 437 S.W.2d 816, 817 (Tex. 1969); *Wilson v. Elliott*, 73 S.W. 946, 947 (Tex. 1903); *Bates v. Tesar*, 81 S.W.3d 411, 436 (Tex. App.—El Paso 2002, no pet.)). In such a case, it is true that a parent's actions before the final judgment may not be considered in determining later whether to modify custody arrangements except to corroborate similar conduct alleged to have occurred after the earlier judgment was signed. *Wilson*, 73 S.W. at 947.

The trial court here entered a temporary order allowing the children to be returned to J.C.C.'s monitored care, stating that there was good cause for the return, presumably to determine whether reunification could be in their best interest. Unlike the monitored return order in *C.B.*, in which the trial court made an explicit finding as to the children's best interest as of the date of the order, the order here made no statement or determination about best interest.

The family code specifically allows a trial court to issue a temporary order for a monitored return, provided the court determines it is in the child's best interest for the court to retain jurisdiction over the case. *See* Tex. Fam. Code § 263.403(a). To hold that the majority of a parent's actions during the pendency of a termination proceeding could not be considered if a trial court enters a monitored return order would discourage the Department and the courts from attempting family reunifications in close cases such as this one. We decline to apply *C.B.* to this case, and we hold that it was proper for the jury to hear and consider evidence related to the children's best interest that arose before the July 2013 monitored return.

Even if we consider facts arising before the children's return, J.C.C. argues, the evidence shows that he was so successful in working his services that there is insufficient support for a finding that termination was in the children's best interest. We disagree.

7

It is true that the record reflects that J.C.C. largely complied with the Department's requirements, submitting to drug tests, taking parenting classes, finding employment and housing, and participating in therapy. However, J.C.C. did not take two of the eight drug tests requested, a hair-follicle test came back positive for methamphetamine use,[4] and he was arrested twice during the pendency of this case, both times due to altercations with J.P. Further, J.C.C. largely ignores factors such as the children's condition when they were removed; the instability in the children's lives while they were with their parents[5]; how their development has improved since their removal; how their behavior worsened around visitations with J.C.C.; the stability of their current (and prospective adoptive) home; J.C.C.'s criminal history and lack of financial support while the children were out of his care; whether he can support two young children under his current employment situation[6]; his parenting abilities and mental and emotional capabilities; and how the children have thrived and learned to feel safe and secure in their foster home.

When we consider all of the evidence and look to *Holley v. Adams* for guidance, we conclude that legally and factually sufficient evidence supports the jury's finding that termination of J.C.C.'s parental rights was in the children's best interest. *See* 544 S.W.2d 367, 372 (Tex. 1976). We affirm the trial court's decree of termination.

---

[4] J.C.C. disputed that test result and denied using methamphetamine.

[5] J.C.C. testified that before their removal, the children moved from house to house, reciting five different homes that the children lived in within approximately two years. However, when asked if the children's living environment was "chaotic," he said they lived "mainly with family members" and that they were always in good hands, with people who knew them well.

[6] J.C.C. testified that for the last three months he had been employed helping an elderly woman from 5:00 p.m. until 11:00 p.m. during the work week, making about $1000-$1200 a month. His rent was $1100 a month, plus utilities.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed:   June 13, 2014