**Affirmed and Memorandum Opinion filed January 29, 2015.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00729-CV

---

## IN THE INTEREST OF B.G. AKA INFANT G., A CHILD

---

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Cause No. 2013-01339J**

---

## M E M O R A N D U M   O P I N I O N

Appellant B.A.Z. (the Father) appeals from the decree terminating his parental rights to B.G., aka Infant G. (the Child).[1] The Father brings a single issue challenging the sufficiency of the evidence supporting the trial court's finding that termination of the Father's parental rights is in the Child's best interest, arguing that his motion for directed verdict should have been granted. We affirm.

---

[1] To protect the identity of the minor, we have not used the names of the Child, parents, or other family members. *See* Tex. R. App. P. 9.8.

# I. BACKGROUND

The Father met the Mother in 2009 when he was age 18 and the Mother was 16. The Child was born October 30, 2010. The Father was not named on the Child's birth certificate, but DNA testing later confirmed his parentage. The Department of Family and Protective Services received a referral on January 9, 2013, alleging the Father physically abused the Child, his then two-year-old son. It was alleged the Father grabbed the Child by the neck, and threw him on the floor toward the wall during a domestic violence incident between the Father and the Mother. After the incident, the Mother and the Child temporarily resided in a domestic violence shelter. On February 28, 2013, the Department filed its petition seeking an investigation of the abuse report and orders for protection of the Child. The Department subsequently moved for termination of parental rights and conservatorship of the Child.

On March 28, 2013, the trial court signed a temporary protective order, finding the Father committed family violence and prohibiting the Father from communicating with, or coming near, the Child or the Mother. A separate order was signed enjoining the Mother from contacting the Father or permitting the Child to have contact with the Father. The trial court also appointed the Department temporary managing conservator of the Child, but permitted the Child to stay with the Mother at a designated domestic violence shelter, as long as she complied with the injunction and protective order. The trial court also signed orders on March 28, 2013, appointing attorneys ad litem for the Father and the Child.

At an adversary hearing on April 3, 2013, the trial court ordered the Father to pay $220 per month in child support. The trial court also signed an agreed protective order continuing the prohibition on the Father's contact with the Mother

or the Child. On May 10, 2013, the Department filed an emergency motion to remove the Child from the Mother, alleging the Mother violated the terms of the injunction by leaving the shelter and moving into the Child's paternal grandmother's home. It was further alleged the Father assaulted the Mother again, and there was concern that the Mother would flee with the Child.[2] The court granted the motion, and the Child was placed in foster care.

On May 28, 2013, the Department filed the Father's family service plan. A status hearing was held May 29, 2013. On June 3, 2013, the court approved the service plan and ordered the Father to comply with the tasks set out in the plan, including participating in domestic violence and anger management counseling. The trial court's order reflects that the Father had reviewed the plan and understood that if he failed to demonstrate an ability provide the Child with a safe environment within a reasonable time, his parental rights were subject to restriction or termination. Periodic status reports were filed and hearings were conducted to monitor the Father's progress and the Child's well-being.

The case was tried to a jury July 21–23, 2014. Before testimony commenced, the Mother voluntarily relinquished her parental rights to the Child. The Mother, the Father, the court-appointed psychologist, the Department's caseworker, and the foster mother testified at trial. At the conclusion of the Department's case in chief, the Father moved for directed verdict on the basis that the Department had not allowed the Child an opportunity to bond with the Father. The motion was denied. The jury determined that the parent-child relationship

---

[2] The record reflects that on April 24, 2013, the 280th District Court issued an agreed protective order against the Father pursuant to Chapter 85 of the Texas Family Code, finding family violence had occurred and was likely to occur again. *See* Tex. Fam. Code § 85.005. The order prohibited the Father's contact with the Mother and Child and ordered the Father to complete an accredited Battering Intervention and Prevention Program. The Father testified that this protective order was later vacated.

between the Father and the Child should be terminated. On August 18, 2014, the trial court signed a final judgment reciting that the Father's parental rights were terminated based on findings that termination is in the Child's best interest and that the Father committed acts establishing the predicate termination grounds set out in subsections D, E, and O of Texas Family Code Section 161.001(1). *See* Tex. Fam. Code §§ 161.001(1)(D), (E) & (O); 161.001(2). The Department was appointed sole managing conservator of the Child. The Father filed a timely motion for new trial challenging the legal and factual sufficiency of the evidence supporting termination, which was overruled by operation of law. He also filed a timely notice of appeal.

## II. BURDEN OF PROOF AND STANDARDS OF REVIEW

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002).

4

"Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

We review a trial court's ruling on a motion for directed verdict just as we do a claim of legally insufficient evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005); *C.B. v. Texas Dep't of Family & Protective Serv.*, 440 S.W.3d 756, 768 (Tex. App.—El Paso 2013, no pet.). "A directed verdict is a procedural device used to ask the court to render judgment without submitting a charge to the jury because there is nothing for a jury to decide." *C.B.*, 440 S.W.3d at 769. A trial court may direct a verdict when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.,* 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

We consider and weigh all of the evidence, including disputed or conflicting evidence, in reviewing termination findings for factual sufficiency of the evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed

evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## III. ANALYSIS

In his sole issue, the Father argues that the evidence is legally and factually insufficient to support the finding that termination of his parental rights is in the best interest of the Child pursuant to section 161.001(2) of the Texas Family Code. Tex. Fam. Code § 161.001(2) ("termination is in the best interest of the child"). The Father claims that the Department did not meet its burden of proof because he was performing the tasks set out in his family service plan, but he had not been provided an opportunity to bond with the Child. For this reason, the Father asserts that the trial court erred in denying his motion for a directed verdict.

### A. Predicate Findings Under Section 161.001(1) not challenged.

The Father has not challenged the predicate termination findings under section 161.001(1). Unchallenged predicate findings are binding on the appellate court. *See In re E.A.F.,* 424 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2014, pet. filed); *In re K.L.G.,* No. 14-09-00403-CV, 2009 WL 3295018 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (mem. op.) (because the predicate and best interest findings were not challenged, they were binding).

The jury made predicate termination findings that the Father had committed acts establishing the grounds set out in subsections D, E, and O, which provide that

termination of parental rights is warranted if the factfinder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
>
> . . .
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

Tex. Fam. Code § 161.001(1)(D),(E) & (O). Evidence supporting unchallenged predicate findings can support the best interest finding. *See In re C.H,* 89 S.W.3d at 27–28 (holding that the same evidence may be probative of both section 161.001(1) predicate grounds and best-interest); *see also In re E.A.F.*, 424 S.W.3d at 750.

### B. Best-Interest Finding Under Section 161.001(2)

We review the entire record in deciding a challenge to the court's best-interest finding. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d at 533. Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a).

Courts may consider the following nonexclusive factors in reviewing the sufficiency of the evidence to support the best interest finding, including: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, and evidence is not required on all of the factors to support a finding terminating parental rights. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. Tex. Fam. Code § 263.307(b); *In re R.R.,* 209 S.W.3d at 116.

### *Present and future physical and emotional danger to the Child.*

The Father has not challenged the jury's findings that he both (1) engaged in conduct that endangered the Child's physical or emotional well-being and (2)

knowingly placed or knowingly allowed the Child to remain in conditions that endangered the Child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(1)(D) & (E). The evidence supporting these unchallenged endangerment findings can support the jury's best-interest finding. *See In re C.H.,* 89 S.W.3d at 27–28.

Moreover, the record contains ample evidence of the Father's endangering conduct. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P*., 99 S.W.3d 841, 845–846 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (stating that such abuse is a factor under *Holley*). The factfinder may infer from past conduct endangering a child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M*., 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). The record reflects that the Department first became involved with the Child because of the Father's dangerous conduct when the Department received a complaint that the Father had physically abused the Child. In January, 2013, it was alleged the Father grabbed the Child by the neck and threw him against the wall during a domestic violence incident between the parents.

The Mother testified at trial that she had been abused by the Father many times. She stated she frequently had bruises, and the Father struck her with a closed fist on many occasions. The Mother testified the Father began beating her when she was sixteen years old and five months pregnant. The Mother described the incident in January, 2013, which led to the Department's involvement. She explained that she was talking on the phone with a man named Ricky, and the Father immediately became angry and began hitting her without giving her an opportunity to explain. The Mother said the Father also punched the wall and threw things around the apartment. She said she attempted to leave by the front

door, but the Father blocked her way. The Mother stated she then tried to climb out the window, and in the process, the blinds fell. The Father became angrier and he wrapped the cord around the blinds to use them as a weapon against her. The Mother testified the Father threatened to break her legs as he hit her legs with the window blinds. The Mother stated that when the incident began, the Child was not in the room, but he came in after hearing the commotion. She said the Father told the Child to go back into the other room, but he did not. The Child began to cry as he watched the Father beat the Mother. The Mother stated the Father told the Child to "shut up," but he cried louder and louder. The Mother testified that the Father then grabbed the Child by the back of his neck and pushed him into the corner to make him be quiet. The Mother testified she attempted to cover the Child, but the Father pulled her off. The Child continued to cry as the Father kept beating the Mother. The Mother testified the beating left bruises, but no serious injuries.

The Mother testified that after the incident, the Father went outside to "smoke weed" with some friends. He placed a chair against the outside of the door to block the Mother from leaving with the Child. The Mother testified she was unable to open the door. After the Father returned, he smelled of marijuana and was still angry, but he did not hit her. The Mother later left with the Child while the Father was sleeping.

When she left the apartment, the Mother said she first wandered around, then she went into a church. A woman who worked at the church let her stay with her until she found a shelter. The Mother testified that she stayed at a battered women's shelter for a week or two. While at the shelter, the Mother filed a report about the incident with the Department. The Mother acknowledged that she then called the Father and his mother to come pick her up. She first stayed at the Father's mother's house, but then returned to the apartment with the Father.

The Mother testified that in April, 2013, the Department's caseworker told her she should not stay with the Father and she should find another shelter. The Mother acknowledged she did not remain at the second shelter and again returned to the Father. When she arrived at the apartment, the Mother testified the Father locked the door, made her undress, and he locked her in the closet with her hands tied behind her back. The Mother testified she began to cry because she could hear her Child out in the hallway. The Mother said the Father then put a sock in her mouth and a bag over her head. The Mother testified the Father then said, "You better pray because this is the last day you're ever going to see." The Mother said she continued to cry, begging, "Just let me say goodbye to [the Child]," and the Father responded, "You're not going to see him ever again." The Mother testified she later passed out. Eventually, she was able to untie herself while the Father was in the living room. The Mother testified that she jumped out of the second story window naked to escape.

The Mother testified that a month before trial, in June, 2014, the Father's mother encouraged her to talk to the Father and get back together. The Mother admitted she was scared at first, but the Father's mother reassured her that the Father had been taking classes and had learned how to control himself. The Mother stated that when the Father came to talk to her and she left the room to go to the bathroom, the Father went through her phone. The Mother testified the Father saw a picture she posted of herself showing some cleavage, and he got upset and changed it. The Mother was angry and told the Father to leave. She testified the Father then got some water and threw it on her. She became afraid because of her past experiences, and she went to the door to leave. The Father blocked her way. He then handcuffed the Mother to a table, took off her clothes, and made videos of her, telling her it was "since you like to show yourself off." The Mother said she

began crying and the Father hit her and punched her. She testified the Father began stabbing bologna and telling her that he wished it was her. The Mother stated that when she finally was able to get away, she ran to the police station and made a report.

The Mother testified that she believes the Father's parental rights should be terminated because if the Father could beat her while he says he loves her, the Father could do the same to the Child. The Mother stated she did not trust the Father and would rather the Child be with people where he will be safe and unharmed. She testified that her decision to relinquish her parental rights was a difficult one, but she knew it was best for the Child.

The Father denied many of the Mother's allegations, but his testimony was inconsistent. The Father acknowledged that the Department became involved with the family "early on," resulting in his split with the Mother. At first, the Father denied engaging in domestic violence against the Mother. The Father then admitted to some abusive behavior toward the Mother, but denied that he had grabbed or hurt the Child. The Father claimed instead that the Mother had grabbed the Child and tried to jump out the window. The Father also claimed the Child was in another room watching television and never came into the room where he and the Mother were fighting. The Father asserted that the Child never witnessed the domestic violence against the Mother, although he acknowledged the Child could have heard the fighting. He admitted to a "little bit" of domestic violence, and he acknowledged that the fights between the parents did not provide a safe environment for the Child. The Father admitted that the Mother filed a criminal complaint against him in June, a month before trial, but he stated the charge was dismissed.

The Father also admitted that "every day" things made him angry. He

acknowledged that he had pushed the Mother during her pregnancy and frequently called her derogatory names. He denied he had an anger problem, however. It was within the jury's discretion to determine the weight and credibility of the Father's testimony. *In re K.A.S.*, 131 S.W.3d 215, 229–30 (Tex. App.—Fort Worth 2004, pet. denied).

The Father was interviewed by the court-appointed psychologist, Dr. Paul Damin, in December, 2013, as part of his court-ordered service plan. The psychologist's report was admitted in evidence at trial. The Father acknowledged to the psychologist that "there was some physical abuse toward [the Mother]," but he claimed the Mother lied about him grabbing his son by the neck and throwing him against the wall.

In addition to at least one arrest for domestic violence, the record contains evidence of other criminal activity. Criminal activity, especially a history of domestic violence, supports a finding that termination is in a child's best interest. *See In re S.R.*, ___ S.W.3d ___, 2014 WL 5898453, at *12 (Tex. App.—Houston [14th Dist.] Nov. 13, 2014, no. pet. h.). The Father admitted he and the Mother were arrested for theft about three years earlier, and he was sentenced to six months' probation. The Father acknowledged his probation was extended to one year because he did not complete the probation requirements timely. The Father stated he was required to complete outpatient drug treatment for marijuana use as part of his court-ordered probation for the theft charge.

A parent's drug use supports a finding that termination is in the best interest of the child. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.); *see also In re J.N.H.*, No. 02–11–00075–CV, 2011 WL 5607614, at *8 (Tex.

13

App.—Fort Worth Nov. 17, 2011, no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming the decision that termination was in the best interest of a child).

The record contains evidence of the Father's drug use. The Father acknowledged he started using cocaine about two weeks after meeting the Mother in 2009. He claimed he only used cocaine for about three months, but he continued to use marijuana. The Father then stated "I never actually did cocaine." The Father told the psychologist who evaluated him in December, 2013 that he last used marijuana about two years earlier. He testified at trial that he last smoked marijuana in the summer of 2013. He stated he and the Mother smoked marijuana together, but the last time would have been at the end of 2011. The Father claimed he later slowed his marijuana use because of conflicts with the Mother. The jury, as the factfinder, was entitled to evaluate the Father's claims that minimized his drug use. *See In re A.J.E.M.-B.*, No. 14-14-00424-CV, 2014 WL 5795484, at \*14 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.).

In sum, the record contains abundant evidence that the Father's conduct endangered the Child, supporting the finding that termination of the Father's parental rights is in the Child's best interest. In addition to drug use and criminal activity, there is evidence that the Father engaged in domestic violence witnessed by the Child and assaultive behavior against both the Child and his Mother. The factfinder reasonably could have considered that the Father's repeated acts of violence would continue in the future. *See Walker v. Texas Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

### *Stability and Compliance with Services*

The Father also has not challenged the jury's finding that he failed to comply

14

with the provisions of a court order establishing the actions necessary for him to obtain the return of the Child after his removal because of abuse or neglect. *See* Tex. Fam. Code § 161.001(1)(O). The evidence supporting the jury's finding under subsection O also can support its best-interest finding. *See In re E.C.R.*, 402 S.W.3d at 249 ("Many of the reasons supporting termination under subsection O also support the trial court's best interest finding."); *see also In re E.A.F.,* 424 S.W.3d at 752 (considering the failure to participate in services required for reunification in reviewing the best-interest determination).

Stability and permanence are paramount in the upbringing of children. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). A parent's failure to show that he is stable enough to parent a child for any prolonged period entitles the trial court "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.).

The record reflects that the Child did not have a stable environment until after he came into the Department's care. The Father testified the parents were not living together after the Child's birth in 2010. In 2011, the Father brought the Mother and the Child to live at his mother's home, where the Father also resided. In early 2013, the parents moved to their own apartment. In February 2013, the Department began its investigation after domestic violence and abuse allegations. The Mother fled to a women's shelter, stayed briefly with the Father's mother, and then attempted to reunite with the Father before returning to a shelter. The Department then removed the Child from both parents' care. Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs. *See In re G.M.G.,* 444 S.W.3d 46, 59–60

15

(Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Doyle v. Tex. Dep't of Protective & Regulatory Servs.,* 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied) (holding that a parent's failure to provide a stable home and provide for a child's needs contributes to a finding that termination of parental rights is in the child's best interest).

In addition, the Father continued to lack stability after the Child was placed in the Department's care. The Department's caseworker, Cristina Sanford, testified about the family plan of service that the Department developed for the Father. She explained that the Department recommends services for a parent to perform before the Department will recommend reunification with a child. The Father's plan included a requirement that he maintain verifiable employment for at least six months and maintain stable housing. In addition, the Father was ordered to submit to a psychological evaluation, complete an assessment by the Children's Crisis Care Center and follow all recommendations made in the assessment, complete individual counseling, and complete classes in domestic violence, anger management, and parenting.

Sanford testified that at the time of trial, the Father had not maintained stable housing and she was not aware that he had a job. Sanford stated the Father has not maintained stable employment for at least six months, as required by his service plan. She testified that throughout the case, the Father had been living in motels, "bouncing around." Evidence of a parent's unstable lifestyle also can support a factfinder's conclusion that termination of parental rights is in the child's best interest. *In re S.B.,* 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Sanford testified that she believes it would be in the Child's best interest to terminate the Father's parental rights.

Sanford testified that the Father was not permitted to visit the Child because

16

of his instances of domestic violence and the protective orders barring his contact with the Child. The Father was required to complete domestic violence and other classes before visits with the Child would be permitted. In addition, Sanford testified that a parent can provide notes, letters, and gifts to maintain contact with a child, and the Father has not done so. She stated the Father also failed to pay child support as ordered. The Father admitted he had not paid any child support. He claimed no one told him it was required, although he acknowledged the court's temporary order required the payments beginning May 11, 2013.

The record reflects that the Father made efforts to comply with the tasks set out in the court-ordered services shortly before trial. The Father provided certificates showing that he completed anger management classes on February 23, 2014, parenting classes on March 15, 2014, a Battering Intervention & Prevention Program on April 8, 2014, and an Anger Management Skills Training program on May 17, 2014. The Father had been ordered to complete these tasks the previous June. The factfinder reasonably could have determined that the Father's changes shortly before trial were too late to impact the best-interest determination. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (explaining that a father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect" in evaluating the best interest of the children).

The Father denied that he was "completely homeless" during the case. He testified that he spent two months in California due to his father's illness. When he returned, he left his apartment because he faced eviction. He then had a hard time finding an apartment and stayed in hotels. The Father testified that he had found a stable residence with a co-worker recently and was helping to pay the bills. The Father acknowledged that he could not raise his Child in his current circumstance,

but he would like his Child to be with his mother. Although the Father wanted more time to complete classes to improve, he admitted that after completing domestic violence and anger management programs, he was arrested for domestic violence against the Mother on June 4, 2014.

The court-appointed psychologist's report recommended that before being reunited with the Child, the Father should "demonstrate stability in his day-to-day life, a commitment to prioritizing his child in his decision making, development of appropriate anger management strategies, an effective discipline strategy, and interpersonal interactions that model effective conflict resolution strategies." The psychologist testified that when he interviewed the Father in December, 2013, the Father was homeless and living in hotels. In his opinion, the Father was not forthright and honest, but was instead seeking to impress and project a positive image. The Father acknowledged that he did not complete his court-ordered therapy, even though he admitted therapy would have helped him with feelings of anger, distrust, betrayal, and anxiety.

In sum, the evidence related to these factors supports a finding that termination of the Father's parental rights is in the best interest of the Child.

### *The Child's Desires, Needs, and Proposed Placement*

The Child was very young at the time of trial and there is no evidence of his desires. When a child is too young to express his desires, the factfinder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The record evidence reveals that the Child is bonded with his foster family. The foster mother testified to her family's attachment to the Child. The Mother

acknowledged that the Child appeared to have bonded with the foster parents. She testified that the Child refers to his foster parents as "mommy" and "daddy." In contrast, at the time of trial, the Father had not seen the Child in over a year.

The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest. *See In re J.N.R.,* 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best-interest determination. *See In re K.C.*, 219 S.W.3d at 931. Therefore, evidence about the present and future placement of the Child is relevant to the factfinder's best-interest determination. *See In re C.H.*, 89 S.W.3d at 28.

Caseworker Sanford testified the Child's current placement is meeting his physical and emotional needs. The Department's plan is for the foster parents to adopt the Child. Sanford testified that the Father has not demonstrated an ability to take care of the Child. Sanford testified that in her opinion, the foster mother would provide a good adoptive home for the Child. She testified that the Child had issues of violent behavior when he first came into the Department's care. After counseling, the Child is significantly better. Sanford attributed the Child's former aggressive behavior to his early exposure to domestic violence in the home. She concluded that the Child is thriving in his present environment. Sanford described the Child's improvement while in his foster home as "miraculous."

The foster mother testified that she is a public school teacher, and her husband is a manager at a retail business. The Child had been living with the foster parents for about eight months at the time of trial. In addition, the foster mother and her husband are in the process of adopting an eleven-month-old baby. She said the Child interacts well with the baby and they are affectionate with each other.

19

The eleven-month-old follows the Child around, and they play together. The Child refers to the baby as his sister. The foster mother testified the children are very attached to each other, and the foster parents are attached to both children.

The foster mother testified that when the Child first came to live with them, he was very aggressive, did not talk much, and was withdrawn. At that time, the Child also was frequently angry and threw tantrums. She described him as angry and sad, and he was unable to sleep through the night. The foster mother described one incident early in her care for the Child when he slapped her as she buckled him in his car seat. The foster mother also said that although he was almost three years old when she began caring for him, the Child did not know how to say his age, did not know his colors or shapes, and he was not potty trained. She said the Child formerly urinated on the floor when he was upset.

Since the Child has been in her home, the foster mother testified he has become a "different kid." She described him as happy and secure. The foster mother stated he talks a lot and is able to verbalize his wishes. She said he is age appropriate in most of his abilities and vocabulary. The foster mother testified that she works with the Child every day on handwriting, counting, and reading. His favorite toys are building blocks, Legos, and stuffed animals. He also likes to play outside, play with the family pets, and go to the park and zoo. The foster mother testified she wants to adopt the Child. She said she wants to encourage him to be whatever he wants when he grows up. At the time of trial, she stated the Child wanted to be a fireman.

The Father acknowledged that it is in the Child's best interest to grow up in a loving home, go to school, and "have food in place," and he admitted that at the time of trial, he was not able to supply these "basics." The Father requested that his parental rights not be terminated so that he could be given "the opportunity to

20

show that [he] could do better."

The Mother testified that in her opinion, the Child should remain in his current foster home. She testified she had seen her Child at that home, and she felt he was happy and would be stable with people who cared about him. She stated that the Child has learned to use the bathroom and now uses full sentences. The Mother understood that the Department wants to place the Child for adoption in his current foster home, and she thought that would be good for the Child.

In sum, the evidence shows that, in contrast to the Father's lack of stability, the Child's placement is stable and is meeting his needs. The Child has bonded with the foster family, and the foster parents want to adopt him. In addition, the Child is thriving; he has made great improvements in his behavior and overall development. This evidence weighs in favor of the finding that termination is in the Child's best interest.

### *Family Support*

There is limited evidence in our record that the Father has family support. He is not close with his own father, who lives in California. The record reflects that the Father maintains a relationship with his mother, and he has lived with her at times. The Mother also testified that the Father, the Child and she lived with the Father's mother for a time. The Father claims that the evidence is insufficient to support a finding that termination is in the Child's best interest because the Department did not prove that the Child could not be placed with a relative. The Father testified that he wanted the Child to be placed with his mother. The paternal grandmother did not testify at trial and there is very little information in the record about her ability to care for the Child or to assist the Father in his care.

The Mother testified that the Father's mother had witnessed him beat her in

the past and did nothing to protect the Mother. The Mother also testified that the paternal grandmother indicated to her that the beatings were the Mother's own fault. The Mother said that the paternal grandmother had also been subjected to abuse, and the abuse had been witnessed by the Father. Caseworker Sanford testified that the Department did not consider placement with the paternal grandmother appropriate because the paternal grandmother had witnessed domestic violence between the Child's parents and did not intervene. Therefore, a reasonable factfinder could conclude that the evidence concerning the Father's mother weighed against placing the Child with her.

### *Parenting Abilities*

The factfinder may consider a parent's parenting skills in a best-interest analysis. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). The Father's parenting skills were evaluated by the court-appointed psychologist. The psychologist's report stated that the Father's "parenting measures indicated significant risk factors." The report stated that the Father's parenting test results reflected "possible problems with overly rigid beliefs and expectations and problems in his relationships with others." The psychologist further opined that these scores suggest "beliefs that children should be neat, be orderly in their behavior, be obedient, never cause trouble, never disobey, stay clean, be seen and not heard, be quiet and attentive, and not talk back." The report stated that these beliefs "may be expressed through the forceful effort to make children fit a rigid mold." The Father's responses "indicated that he endorsed beliefs consistent with expecting strict obedience to his demands and having low empathic awareness of children's needs." The report recommended the Father participate in individual psychotherapy, anger management intervention, and parenting classes. The Father presented evidence that he had completed eight

weeks of parenting classes at the Depelchin Children's Center. He also completed eight hours of anger management skills training and thirty-six hours of battering intervention and prevention education. While the Father completed some of the services recommended by the psychologist and ordered by the court, he acknowledged he did not complete therapy that he recognized might help with his issues. Moreover he was arrested for domestic violence again after completion of anger management and domestic violence classes, demonstrating that he had not benefitted from the classes.

The Father also complains that he was not given an opportunity to bond with the Child. The Father was not permitted to visit the Child after February, 2013, when the Department investigated abuse allegations and protective orders against the Father were first issued. The trial court ordered the Father to stay away from the Child based on the Father's pattern of violent abuse, and the Father was required to participate in therapy before visits with the Child would be permitted.

Although the prohibitions against contact with the Child were not enacted until the Child was almost two years old, our record contains scant evidence about the Father's abilities to take care of the Child. The Mother testified that the Father sent the Child into another room when the parents fought, indicating the Father was aware that it was inappropriate for the Child to witness the physical abuse. Other evidence shows the Child was fearful and crying while in the Father's presence, and the Mother testified the Father grabbed the Child by the neck and shoved him against a wall. We may consider the Father's past performance as a parent in evaluating his fitness to provide for the Child and determination that termination of his parental rights would be in the Child's best interest. *See In re C.H.*, 89 S.W.3d at 28. Although evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, a fact finder may measure a parent's

future conduct by his past conduct and determine that it is in a child's best interest to terminate his parental rights. *See In re A.N.D.,* No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.).

The record evidence about the Father's parenting abilities weighs in favor of the jury's finding that termination is in the best interest of the Child.

At the conclusion of the trial, the Father asked that his rights not be terminated, expressing a desire to "do better" in the future. The Father had not demonstrated that he had learned from the classes he had completed because he continued to engage in domestic violence and showed an inability to control his anger. In addition, the Father's testimony contained many inconsistencies, which the jury evaluated. The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re H.R.M.*, 209 S.W.3d at 108. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

In sum, the record contains evidence supporting the jury's best-interest finding based on the Father's history of violent, endangering conduct, drug use, lack of stable housing and employment, and failure to complete all court-ordered services. *See In re S.B.*, 207 S.W.3d at 887–88 (considering the parent's drug use, inability to provide a stable home, and failure to comply with his family service plan in holding the evidence supported the best interest finding). Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of the Father's parental rights is in the Child's best interest. *See J.F.C.*, 96 S.W.3d at 265–66.

Furthermore, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the best interest finding is

not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of the Father's parental rights is in the Child's best interest. *See In re H.R.M.*, 209 S.W.3d at 108.

After considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the jury's finding that termination of the parent-child relationship is in the Child's best interest. *See* Tex. Fam. Code § 161.001(2). Therefore, the trial court did not err in denying the Father's motion for directed verdict. We overrule the Father's sole issue.

## IV. CONCLUSION

The Father did not challenge the predicate termination grounds. We have determined that legally and factually sufficient evidence supports the jury's finding that termination of the Father's parental rights is in the best interest of the Child. Therefore, the trial court did not err in denying the Father's motion for directed verdict. The judgment is affirmed.

/s/    Martha Hill Jamison
        Justice

Panel consists of Justices Jamison, Busby, and Brown.