

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00416-CV

**IN THE INTEREST OF A.H.**, A.H., and A.H., Children

From the 407th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-00033
Honorable Brenda Chapman, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Marialyn Barnard, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  November 25, 2015

AFFIRMED

This is an accelerated appeal from the trial court's order terminating appellant father's ("Father") and appellant mother's ("Mother") parental rights to their three children, Annie, April and Ariel.[1]  Although Father and Mother separately appeal the trial court's order, neither parent challenges the sufficiency of the evidence to support the trial court's findings relating to the statutory grounds for termination.  Rather, both parents contend the evidence is legally and factually insufficient to support the trial court's finding that termination was in the children's best interests.  We affirm the trial court's order of termination.

---

[1] All three children share the same first and last initials.  Therefore, in order to refer to the children individually when necessary and to protect their identity, we shall refer to each of the children by the above referenced pseudonyms. *See* TEX. FAM. CODE § 109.002(d) (West 2014); *In re E.A.T.*, No. 04-14-00705-CV, 2013 WL 694929, at *1 (Tex. App.— San Antonio Feb. 18, 2015, no pet.) (mem. op.).

**BACKGROUND**

Raquel Rodriguez is an investigator with the Texas Department of Family and Protective Services ("the Department"). She became involved with the family after receiving reports of negligent supervision and physical neglect regarding two of the family's three children, Annie and April. At that time, Annie and April were approximately two and one and a half-years-old, respectively, and Ariel, the family's third child, was not yet born. According to Ms. Rodriguez, the Department implemented a family-based service plan and placed Annie and April with a relative. During this time, Mother and Father were allowed supervised access to the children. At some point during the course of the family-based service plan, the children were left unsupervised, and April suffered a serious leg injury. According to Mother, the family was visiting her father, and she put the children down for a nap in one of the bedrooms. The mattress, which was three and a half feet from the floor, rested on a larger bed frame, creating a gap. The record reflects that April somehow fell through the gap and seriously fractured her leg. April was taken to the hospital, and the Department was immediately alerted about the incident.

Thereafter, the Department initiated legal proceedings, ultimately seeking to terminate Mother's and Father's parental rights to Annie and April. The trial court granted the Department temporary emergency conservatorship, and service plans were created for the parents. During this time, Mother gave birth to Ariel, and the Department amended its petition, seeking to terminate Mother's and Father's rights to her as well. Over the next couple of months, the required statutory hearings were conducted, and during this time period, the children stayed with two foster families. All three children were ultimately placed with one of those families.

The case proceeded to a bench trial, and the trial court heard testimony from ten witnesses, including Mother and Father. At the conclusion of the trial, the trial court rendered an order terminating Father's and Mother's rights, finding both parents had violated sections

161.001(1)(D), (E) and (O) of the Texas Family Code ("the Code") and that termination was in the children's best interests.[2] *See* TEX. FAM. CODE. ANN. §§ 161.001(1)(D), (E), (O), (2) (West 2014). Thereafter, Mother and Father perfected their appeals.

## ANALYSIS

As previously noted, neither Mother nor Father contest the trial court's findings under section 161.001(1) of the Texas Family Code. Mother and Father raise the same single issue, arguing the evidence is legally and factually insufficient to support the trial court's finding that termination was in the best interests of the children.

### *Standard of Review*

A trial court may order the termination of a parent-child relationship if the trial court finds by clear and convincing evidence that: (1) the parent committed one of the grounds listed under subsection one of section 161.001 of the Code; and (2) termination is in the best interest of the child. *Id.* §§ 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re E.A.G.*, 373 S.W.3d 129, 140 (Tex. App.—San Antonio 2012, pet. denied). "Clear and convincing evidence" is defined as "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see J.O.A.*, 283 S.W.3d at 344; *E.A.G.*, 373 S.W.3d at 140. A heightened standard of review is applied because termination of a parent's rights to his or her child results in severe and permanent changes to the parent–child relationship, implicating due process concerns. *E.A.G.*, 373 S.W.3d at 140. Furthermore, a termination decision cannot be based on only the grounds

---

[2] Specifically, the trial court found both parents knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being; engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being; and failed to comply with the provisions of a court order that established the actions necessary for the parents to obtain the return of the children. *See* TEX. FAM. CODE. ANN. §§ 161.001(1)(D), (E), (O).

listed under subsection one of section 161.001 of the Code; both elements must be established. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.3d 531, 533 (Tex. 1987); *In re C.B.*, 440 S.W.3d 756, 767 (Tex. App.—El Paso 2013, no pet.).

When reviewing the evidence for legal sufficiency, we view all the evidence in the light most favorable to the trial court's findings and judgment, and we determine whether the evidence is such that a fact finder could reasonably form a firm belief that termination was in the best interest of the child. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We resolve any disputed facts in favor of the trial court's findings so long as a reasonable fact finder could have done so, and we disregard all evidence a reasonable fact finder could have disbelieved. *Id.* In other words, we consider evidence favorable to termination if a reasonable fact finder could, and we disregard contrary evidence unless a reasonable fact finder could not. *Id.* We do not weigh witness credibility if it depends on the appearance and demeanor of the witness because such issues are within the domain of the trier of fact. *Id.* Even if credibility issues are found in the appellate record, we must defer to the fact finder's reasonable determinations. *Id.*

When reviewing the evidence for factual sufficiency, we consider whether the evidence is such that a reasonable fact finder could have reasonably formed a firm belief or conviction in the truth of the trial court's findings. *Id.* (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We give due deference to the fact finder's findings and avoid substituting that judgment for our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Just as in a legal sufficiency review, the determination of a witness's credibility and demeanor is made by a trier of fact, and we cannot second guess the fact finder's resolution of factual disputes. *Id.*

### *Best Interests — Substantive Law*

Courts take into account a number of presumptions and factors when determining whether the termination of the parent-child relationship is in the best interest of a child. *In re R.R.*, 209

S.W.3d 112, 116 (Tex. 2006) (per curiam); *see also* TEX. FAM. CODE ANN. § 263.307(a). As for applicable presumptions, there is a strong presumption that maintaining the parent–child relationship is in a child's best interest. *R.R.*, 209 S.W.3d at 116. Courts also presume, however, that promptly and permanently placing a child in a safe place in a timely manner is in the child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(a). Accordingly, although parental rights are of constitutional magnitude, they are not absolute. *Jordan v. Dosey*, 325 S.W.3d 700, 729 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

As for applicable factors to consider, in *Holley v. Adams*, the Texas Supreme Court set forth the following nonexclusive factors (collectively, "the *Holley* factors") that courts may take into account when reviewing the sufficiency of the evidence to support a best interest finding. 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include:

1. the desires of the child;

2. the emotional and physical needs of the child now and in the future;

3. the emotional and physical danger to the child now and in the future;

4. the parental abilities of the individuals seeking custody;

5. the programs available to assist these individuals to promote the best interest of the child;

6. the plans for the child by these individuals or by the agency seeking custody;

7. the stability of the home or proposed placement;

8. the acts or omissions of the parent which may indicate the existing parent–child relationship is not a proper one; and

9. any excuse for the acts or omissions of the parent.

*Id*. These factors are nonexhaustive, and evidence is not required on all of them to support a finding that termination of parental rights is in a child's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *Holley*, 544 S.W.2d at 371–72. The absence of evidence as to some of the

*Holley* factors does not preclude a trier of fact from reasonably forming a strong conviction or belief that termination is in a child's best interest. *C.H.*, 89 S.W.3d at 27. In some cases, evidence of merely one factor may suffice as support of a finding that termination is in the best interest of a child. *Jordan*, 325 S.W.3d at 729 (citing *C.H.*, 89 S.W.3d at 27). Moreover, the same evidence used to prove acts or omissions under section 161.001(1) of the Code may be probative in determining the best interest of a child. *C.H.*, 89 S.W.3d at 28 (citing *Holley*, 544 S.W.2d at 370; *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex. 1976)).

Section 263.307(b) of the Texas Family Code also sets out factors courts may consider when evaluating whether a parent is willing and able to provide the child with a safe environment, including: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.*

§ 263.307(b); *R.R.*, 209 S.W.3d at 116; *In re A.S.*, No. 04-14-00505–CV, 2014 WL 5839256, at *2 (Tex. App.—San Antonio Nov. 12, 2014, pet. denied) (mem. op.).

Finally, when conducting a best interest analysis, courts "may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *A.S.*, 2014 WL 5839256, at *2 (citing *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied)). A fact finder may judge a parent's future conduct by her past conduct to determine whether termination of the parent–child relationship is in the best interest of the child. *Id.*

### *Best Interests — Application*

As indicated above, Mother and Father assert the evidence is legally and factually insufficient to support the trial court's finding that termination was in the children's best interests. According to Father, the Department's case was based on the children's alleged failure to thrive, April's leg injury, and allegations of domestic violence, each of which he contends was not proven by sufficient evidence. Mother, however, argues there was no evidence as to several of the *Holley* factors, and therefore, there was insufficient evidence to support the trial court's finding that termination was in the children's best interests. We disagree with Father and Mother.

As mentioned above, a court need not find evidence of each *Holley* factor before it terminates a parent–child relationship. *See C.H.*, 89 S.W.3d at 27. The absence of evidence as to one or more of the *Holley* factors does not prohibit a court from reasonably forming a strong conviction or belief that termination is in a child's best interest. *Id.* Here, we hold the evidence that does exist is legally and factually sufficient to support the trial court's finding that it was in the children's best interests to terminate both Mother's and Father's parental rights.

1. *Desires of the Child*

At the time of trial, Annie, April, and Ariel were three, two, and one-year-old, respectively, and unable to indicate their desires as to placement. *See* TEX. FAM. CODE ANN. § 263.307(b)(1)

(child's age and physical and mental vulnerabilities); *Holley*, 544 S.W.3d at 371–72. According to the children's foster mother, the children never talked about Mother, Father, or returning home. The children's foster mother testified that before visiting Mother and Father, the children did not express any opinion as to whether they wanted to visit their parents. And, although sometimes the children became a little reluctant when they arrived to see their Mother and Father, for the most part, the children were indifferent. Thus, the children's ages render the first *Holley* factor — the children's desires — immaterial. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.3d at 371–72; *see also In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (concluding that age of child — one-year-old — rendered consideration of desire neutral).

### 2. *Emotional and Physical Needs of Child Now and in the Future*

With regard to the children's emotional and physical needs, the Department produced evidence that two of the children were malnourished as a result of their parents' neglect. *See* TEX. FAM. CODE ANN. § 263.307(b)(4) (child's age and physical and mental vulnerabilities); *id.* § 263.307 (b)(12) (child's family demonstrates adequate parenting skills); *Holley*, 544 S.W.3d at 371–72. The record reflects the Department became involved with the family after receiving reports that Annie and April were significantly underweight. As part of its investigation, the Department visited the family and took photographs of the children, which were forwarded to Dr. Shalon Nienow, a pediatrician who specializes in child abuse and neglect at the San Antonio Children's Hospital.

Dr. Nienow testified that after reviewing the photographs, she asked to examine Annie and April. Dr. Nienow testified she examined the children during the course of the family-based service plan and concluded they were "extraordinarily underweight." The doctor stated their weight conditions were "very concerning" because the children ranked well below the third percentile of other children their age. With regard to April, Dr. Nienow pointed out she

"especially, was really little [and] had hanging skin folds in her armpits, and her butt skin was kind of sagging which we see in kids who have no subcutaneous fat."

In addition to these physical signs of malnourishment, Dr. Nienow testified Annie and April exhibited signs of developmental delay. Specifically, April, who was two-years-old at the time of the visit, could not speak and just started walking, an ability most children achieve when they are between ten and fourteen-months-old. Dr. Nienow also testified April was not crawling, cruising, or pulling herself to stand, indicating she was considerably developmentally delayed. According to Dr. Nienow, the children's growth charts indicated the children's malnourishment must have existed for a prolonged period of time because they measured significantly below normal in all areas of growth — weight, height, and head circumference.

The record reflects that as a result of the exams, Dr. Nienow admitted Annie and April to the hospital for four days where they received nutritional supplements and gained "exorbitant amounts of weight." When the children were discharged from the hospital, the parents were given a prescription for Pediasure, a nutritional supplement, and referred to the Women, Infants, and Children's Program ("WIC") to obtain the supplement at no cost and to Early Childhood Intervention ("ECI") services so the children could receive physical and occupational therapy. According to Dr. Nienow, she saw the children for a follow-up visit and learned the parents had not made arrangements with WIC or ECI for the children to receive their nutritional supplements and therapy. Dr. Nienow testified she called the WIC office that day and made arrangements for the parents to receive the prescribed Pediasure; however, the parents never went to the WIC office to retrieve it. Dr. Nienow testified she was highly concerned the parents took no responsibility for the children's malnutrition. Dr. Nienow stated she asked Mother whether the children were being fed differently, and Mother informed her the children were eating just as they had before,

suggesting no changes had been made. Dr. Nienow testified she did not see the children again before the Department was granted temporary custody.

After hearing testimony from Dr. Nienow, the trial court heard testimony from Mother regarding the children's weight. Mother testified she recognized Annie and April were underweight and addressed the issue with the family's pediatrician. Mother testified the family pediatrician instructed her to switch baby formulas for Annie; however, it made the situation worse, so she switched Annie back to her old formula. Mother added she believed Annie's weight issues had been resolved prior to Annie's exam with Dr. Nienow. When asked about April, Mother could not recall what steps were taken to address April's weight issues. However, as indicated above, Dr. Nienow testified both children were significantly underweight at the time of the exam. Lastly, Mother testified she was unable to utilize WIC or ECI services due to transportation issues.

Here, the evidence undisputedly shows Annie and April displayed signs of dramatic weight loss and lack of growth — specifically height and head circumference. Such evidence indicates they were deprived of proper nourishment for a prolonged period of time. The evidence also establishes that neither parent fully understood the significance of Annie's and April's malnourishment. Thus, consideration of the second *Holley* factor — emotional and physical needs of the children now and in the future — weighs in favor of termination. *See* TEX. FAM. CODE ANN. § 263.307(b)(4); *id.* § 263.307 (b)(12); *Holley*, 544 S.W.3d at 371–72.

   3. *Emotional and Physical Danger to Child Now and in the Future*

A child's emotional and physical well-being is endangered when he or she is exposed to loss or injury or his or her emotional or physical health is jeopardized. *In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *6 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.). Here, in addition to testimony of neglect in the context of malnourishment, the trial court heard evidence regarding child endangerment, including additional instances of neglect,

domestic violence, and Father's dangerous lifestyle. *See* Tex. Fam. Code Ann. § 263.307(b)(4) (whether child victim of repeated harm after Department intervention); *id.* § 263.307(b)(7) (history of abusive or assaultive conduct by child's family); *Holley*, 544 S.W.3d at 371–72.

### a. Additional Instances of Neglect

As mentioned above, the Department discontinued family-based services and initiated the termination action after April severely injured her leg. During trial, both parents testified April fell off a bed; however, Dr. Nienow testified the parents' explanation was unlikely.

Mother testified she put the children down for a nap, but soon after, Father informed her the children were awake. Mother testified that when she and Father went to check on the children, they discovered April on the floor, crying. According to Father, April must have been trying to climb off the bed and her leg became caught in the gap between the mattress and bed frame. However, after reviewing April's X-rays, Dr. Nienow testified Father's explanation was highly unlikely because April could not walk, and therefore, would not have been able to climb off the bed "feet first." Dr. Nienow opined April would "go head first and would suffer some injury to the head or arms."

Nevertheless, whether Father or Dr. Nienow was correct, the evidence shows the young children were left unsupervised on an adult bed which was several feet off the ground and had a large gap between the mattress and bedframe. Such evidence suggests parental failure to protect the children from danger. *See* Tex. Fam. Code Ann. § 263.307(b)(4); *id.* § 263.307 (b)(12); *Holley*, 544 S.W.3d at 371–72; *see also In re J.P.*, No. 02-12-00121-CV, 2012 WL 5949492, at *10 (Tex. App.—Fort Worth Nov. 29, 2012, no pet.) (mem. op.) (concluding evidence of child suffering tibia fracture as result of neglectful supervision was sufficient evidence for best interest finding).

### b. Domestic Violence

Moreover, the Department produced evidence that Annie and April were exposed to episodes of domestic violence between Mother and Father. *See* TEX. FAM. CODE ANN. § 263.307(b)(7). San Antonio Police Officer Matthew Porter testified he met Mother after responding to a domestic violence call. Officer Porter testified Mother was visibly upset and shaken because according to Mother, she and Father had been arguing all day. Officer Porter testified Mother told him Father slapped her on the right side of her face and punched her in her throat. Officer Porter added that Mother's injuries were visible, particularly the redness and swelling on her face.

Ms. Rodriguez, the Department caseworker, also testified that during the course of the service plan, Mother called her, stating Father confronted her at her work, knocked items off the shelves, and told her he was going to "mess up her CPS case." Ms. Rodriguez testified Mother acknowledged Father would physically abuse her while the children were in her care, and as a result, she was fearful because Father was controlling. At trial, however, Mother retracted her prior claims of domestic violence, claiming she lied to Officer Porter about Father's actions because Father did not intentionally hit her, and with regard to the work incident, she called the police only because her supervisor requested she call.

The trial court also heard evidence from two domestic violence counselors who met with the couple. In accordance with the service plan, both Father and Mother were required to attend domestic violence counseling sessions; however, Father only attended three sessions before "disappearing," resulting in his discharge from the program. At trial, both counselors testified Father was reluctant to participate in the counseling sessions and exhibited signs of denial about the abuse. As a result, Father did not make any progress during any of his counseling sessions.

As for Mother, both counselors testified Mother showed "some progress," but lacked the ability to protect her children given she reunited with Father during the course of the treatment.

Evidence of the parents' history of domestic violence supports the trial court's best interests finding. *See In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (stating domestic violence supports finding that termination is in child's best interest even when child is not victim of violence). "A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being." *T.R.M.*, 2015 WL 1062171, at \*6. Specifically, instances of domestic violence may be considered evidence of endangerment. *Id.* Moreover, a parent's continued exposure to the other parent's dangerous conduct is also evidence of endangerment and a relevant consideration in determining a child's best interest. *In re O.N.H.*, 401 S.W.3d 681, 684–85 (Tex. App.—San Antonio 2013, no pet.) (considering parent's exposure to other parent's drug habits as relevant factor in determining child's best interest).

In this case, the trial court could have reasonably concluded that Father's refusal to address the domestic violence issue, and Mother's willingness to remain in a violent relationship, suggested similar conduct would occur in the future, thereby constituting evidence of emotional and physical danger to the children now and in the future. *See* TEX. FAM. CODE ANN. § 263.307(b)(7); *Holley*, 544 S.W.3d at 371–72. We conclude such evidence weighs against any finding that Father or Mother have the ability to provide the children with a safe environment. *See* TEX. FAM. CODE ANN. § 263.307(b)(7); *Holley*, 544 S.W.3d at 371–72; *see also In re J.D.*, No. 02-11-00328-CV, 2012 WL 3115804, at \*19 (Tex. App.—Fort Worth Aug. 2, 2012, no pet.) (mem. op.) (construing Mother's willingness to remain with abusive partner as sufficient evidence of Mother's inability to provide child with safe environment); *In re K.A.S.*, 131 S.W.3d 215, 226 (Tex. App.—Fort Worth 2004, pet. denied) (concluding ongoing abuse between Father and Mother

resulted in emotional problems for children and weighed against parents' ability to provide danger-free environment).

### c. Father's Dangerous Lifestyle

Finally, the record contains evidence that Father was engaged in a dangerous lifestyle. Father testified he could not recall how many times he had been arrested — "[m]aybe like two or three times" — during his adult lifetime. The Texas Supreme Court has recognized that a pattern of arrest is a relevant factor in a best interests analysis. *See Boyd*, 727 S.W.2d at 534; *see also In re M.A.R*, No. 04-01-00573-CV, 2002 WL 31015267, at *2 (Tex. App.—San Antonio Sept. 11, 2002, no pet.) (not designated for publication). Here, Father testified he had been arrested for theft, possession of marijuana and cocaine, possession of an illegal weapon, and failure to identify.

The evidence also established Father, as well as Father's family, has a history of gang involvement. This court has held that a parent's criminal background, gang affiliation, and violence is evidence relevant to a best interest determination. *See M.A.R.*, 2002 WL 3105267, at *2. The record reflects Father was involved in several incidents in which he and his family were violently attacked. Father testified four men shot his father when Father was visiting his family, and on another occasion, his half-brother stabbed his brother and father and also tried to shoot him. In light of the evidence set forth above, we conclude the evidence reasonably supports a trial court's finding that it would not be in the children's best interests to remain with Father and Mother. *See* TEX. FAM. CODE ANN. § 263.307(b)(7); *Holley*, 544 S.W.3d at 371–72.

### 4. *Parental Abilities*

As to Mother's and Father's parental abilities, the evidence shows Mother and Father failed to demonstrate a positive change during the course of their involvement with the Department. *See* TEX. FAM. CODE ANN. § 263.307(b)(11) (willingness and ability of child's family to effect positive environmental and personal changes within reasonable time period); *id.* § 263.307(b)(12) (whether

child's family demonstrates adequate parenting skills); *Holley*, 544 S.W.3d at 371–72. A volunteer with Child Advocates of San Antonio ("CASA") testified she observed the parents during their visits with the children at the Department's offices. She testified the parents did not play or interact with the children and would need to be regularly reminded to change the children's diapers. The volunteer opined neither parent exhibited any proactive parenting skills and both appeared overwhelmed. She also testified Father failed to attend any visits when Mother and Father had temporarily separated. Similarly, Ms. Rodriguez testified the parents were distant and Father did not regularly see the children during the scheduled visitation time. Such evidence indicates neither Mother nor Father were able to provide appropriate care for their children. *See* TEX. FAM. CODE ANN. § 263.307(b)(11); *id.* § 263.307(b)(12); *see also In re Z.R.M.*, No. 04-15-00063-CV, 2015 WL 4116049, at *6–*7 (Tex. App.—San Antonio July 8, 2015, no pet.) (concluding that evidence of mother arriving late or failing to attend visits impacted child's emotional well-being).

Ms. Rodriguez also testified Mother, who was pregnant with a fourth child,[3] did not receive prenatal care until five months into her pregnancy and did not regularly follow up with a doctor during the course of her pregnancy. Mother's failure to obtain prenatal care in a timely manner in combination with her failure in obtaining the nutritional supplements for her current children demonstrates her lack of parental abilities. *See Smith v. Tex. Dep't of Family and Protective Servs.*, Nos. 01-09-00173-CV & 01-09-00390-CV, 2009 WL 4359267, at *12 (Tex. App.—Houston [1st Dist.] Dec. 3, 2009, no pet.) (mem. op.) (holding that Mother's failure to obtain prenatal care for child weighed in favor of termination). Accordingly, we hold the evidence produced was sufficient

---

[3] At the beginning of trial, the trial court learned Mother gave birth to a fourth child, who is not subject to this termination proceeding. However, the Department initiated termination proceedings as to this fourth child, and at the conclusion of the trial, the trial court appointed the Department as temporary managing conservatorship of this child.

for the trial court to conclude that Mother's and Father's lack of parental abilities weighed in favor of termination.

### 5. *Programs Available to Assist Parents*

The record establishes that when the Department became involved with the family, it provided Mother and Father with a family-based service plan, outlining the tasks they needed to complete to avoid termination of their parental rights. *See* TEX. FAM. CODE ANN. § 263.307(b)(10) (willingness and ability of child's family to seek out, accept, and complete counseling services); *id.* § 263.307(b)(11); *Holley*, 544 S.W.3d at 371–72. However, both parents failed to adhere to the family-based service plan implemented by the Department and as a result, April was injured. At that time, the parents were allowed supervised visits with Annie and April, who were being cared for by a relative. Nevertheless, the record reflects neither parent was supervised by the relative when April was injured.

The record also establishes that when the trial court granted the Department temporary custody of the children, the Department provided Mother and Father with a service plan, detailing the steps they needed to take to attain reunification with the children. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *id.* § 263.307(b)(11); *Holley*, 544 S.W.3d at 371–72. The plan provided information concerning resources and providers to assist the parents in completing the plans. The evidence, however, shows Mother and Father failed to complete several tasks outlined in their service plans and failed to comply with certain directions in the plans. The record reflects Father failed to successfully complete his service plan and expressed reluctance to participate in numerous services offered to him. According to Father, he was unable to actively participate in the service plan due to work obligations; however, both Ms. Rodriguez and the CASA volunteer testified Father was disengaged, often blaming the Department for his current situation. And, as indicated

above, Father did not complete his domestic violence counseling sessions, and both counselors reported his lack of progress.

Moreover, the evidence establishes Mother did not successfully complete the service plan in that she: (1) failed to complete certain aspects of the plan — maintain appropriate employment, become financially stable, or obtain appropriate housing; and (2) failed to implement the knowledge gained from the programs she did complete. *See In re M.C.*, No. 04-14-00805-CV, 2015 WL 2375980, at \*14 (Tex. App.—San Antonio May 18, 2015, no pet.) (stating Mother's failure to apply knowledge learned from domestic violence classes weighs in favor of termination). In addition, both Dr. Nienow and Ms. Rodriguez testified as to their concerns regarding Mother's lack of understanding regarding Annie's and April's nourishment issues. There was also concern about Mother's decision to remain in an abusive relationship with Father. Based on the foregoing evidence, the trial court could have determined both parents failed to utilize programs offered by the Department, which weighs against reunification. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *id.* § 263.307(b)(11); *Holley*, 544 S.W.3d at 371–72.

6. *Plans for Children/Stability of Home or Proposed Placement*

The trial court heard evidence that all three children are in a safe and stable foster home with a family who has demonstrated the ability to care for and manage the children. *See Holley*, 544 S.W.3d at 371–72. Both foster parents testified they love the children and desire to adopt them,[4] when given the opportunity. Moreover, the CASA volunteer testified the foster home is a "very loving atmosphere," highlighting the fact that the children were more affectionate with their foster parents than with their biological parents. "When a prospective adoptive parent is standing in the wings, ready and willing to adopt the child, courts are more likely to find that termination is

---

[4] Both foster parents also expressed interest in fostering Mother's fourth child, who, as indicated above, is not a subject of this appeal.

in the children's best interest." *See Smith*, 2015 WL 4359267, at *13. Here, the evidence shows a foster family is readily available to adopt the children and provide them with a loving home, weighing in favor of termination. *See id.*

### 7. *Parent's Acts or Omissions*

Finally, with regard to the last two *Holley* factors — parent's acts or omissions that indicate current parent-child relationship is improper and parent's excuses for such omissions — the evidence set forth above establishes Annie and April were unsupervised and severely malnourished while in both parents' custody. *See Holley*, 544 S.W.3d at 371–72. When the children were removed from the parents' custody, the Department implemented a service plan to help Mother and Father become suitable parents. However, neither parent completed the service plan outlined for them nor did they utilize the WIC or ECI resources provided to help their children's nutritional issues. Despite the fact both parents were aware the return of their children was conditioned on completion of the service plan, both parents cited transportation issues or work obligations as excuses for not meeting their service plan goals. Moreover, the evidence revealed Father's criminal history, gang involvement, as well as abusive conduct toward Mother. Both domestic violence counselors and Ms. Rodriguez testified as to their concerns that there was domestic violence in the home and Mother continually exposed her children to it, reuniting with Father during the course of the Department's involvement.

### CONCLUSION

After reviewing the evidence above in light of the *Holley* and statutory factors, and indulging the necessary presumptions, we conclude the trial court could have reasonably formed a firm belief or conviction that termination was in the children's best interests. *See J.P.B.*, 180 S.W.3d at 573. The trial court was permitted to consider the direct and circumstantial evidence, and when reviewing such evidence, we must defer to the trial court's reasonable determinations.

*Id.* Although Mother and Father denied the Department's allegations of neglect and testified they attempted to comply with the Department's requirements, the trial court was permitted to weigh witness credibility determinations, and again, we must resolve any conflicting testimony in favor of the trial court's ultimate findings. *See id.* We therefore hold the trial court did not abuse its discretion in finding termination of Father's and Mother's parental rights would be in their children's best interests, and we affirm the trial court's termination order. *See A.S.*, 2014 WL 5839256, at *2.

Marialyn Barnard, Justice